# United States Court of Appeals
# for the Seventh Circuit

REGINALD CLAY,
*Plaintiff-Appellee,*
v.
UNION PACIFIC RAILROAD COMPANY,
*Defendant-Appellant.*

-and-

BRANDON WILLIS, individually and on behalf of others similarly situated,
*Plaintiff-Appellee,*
v.
UNIVERSAL INTERMODAL SERVICES, INC., *et al.,*
*Defendants-Appellants.*

-and-

JOHN GREGG,
*Plaintiff-Appellee,*
v.
CENTRAL TRANSPORT, LLC,
*Defendant-Appellant.*

On Appeal from the United States District Court for the Northern District of Illinois
Nos. 1:24-cv-4194 (Hon. Georgia N. Alexakis), 1:21-cv-1716 (Hon. Elaine E.
Bucklo), and 1:24-cv-1925 (Hon. Elaine E. Bucklo)

**CONSOLIDATED BRIEF AND SUPPLEMENTAL APPENDIX OF PLAINTIFFS-
APPELLEES CLAY, WILLIS, AND GREGG**

Daniel A. Edelman
Dulijaza (Julie) Clark
Edelman, Combs, Latturner &
    Goodwin, LLC
20 South Clark Street
Suite 1800
Chicago, IL 60603
(312) 739-4200
dedelman@edcombs.com

Daniel R. Brown
Paul J. Ripp
Williams Barber & Morel Ltd.
233 South Wacker Drive
Suite 6800
Chicago, IL 60606
(312) 443-3200
drb@williamsbarbermorel.com

David M. Bizar
DJC Law, PLLC
1012 W Anderson Ln
Austin, Texas 78757
(512) 220-1800
dbizar@teamjustice.com

*Counsel for Reginald Clay*

*Counsel for Brandon Willis*

*Counsel for John Gregg*

ORAL ARGUMENT REQUESTED

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-8011

Short Caption: Reginald Clay v. Union Pacific Railroad Company

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Reginald Clay

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Edelman, Combs, Latturner & Goodwin, LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Daniel A. Edelman    Date: 11/19/25

Attorney's Printed Name: Daniel A. Edelman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✓    **No** ☐

Address: 20 S. Clark St., Ste. 1800

    Chicago, IL 60603-1841

Phone Number: 312-739-4200    Fax Number: (312) 419-0379

E-Mail Address: Dedelman@edcombs.com; courtecl@edcombs.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-8011

Short Caption: Reginald Clay v. Union Pacific Railroad Company

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Reginald Clay

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Edelman, Combs, Latturner & Goodwin, LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Dulijaza Clark      Date: 11/19/25

Attorney's Printed Name:  Dulijaza Clark

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☑  **No** ☐

Address:  20 S. Clark St., Ste. 1800

       Chicago, IL 60603-1841

Phone Number: 312-739-4200      Fax Number:  (312) 419-0379

E-Mail Address: jclark@edcombs.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2762

Short Caption: Gregg v. Central Transport, LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Gregg

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

DJC Law, PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ David M. Bizar    Date: 11/19/2025

Attorney's Printed Name: David M. Bizar

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☑ No ☐

Address: DJC Law, PLLC, 1012 W Anderson Ln, Austin, Texas 78757

Phone Number: 512-220-1800    Fax Number: 512-220-1801

E-Mail Address: dbizar@teamjustice.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-8021</u>

Short Caption: <u>Brandon Willis v. Universal Intermodal Services, Inc. et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Brandon Willis

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Williams Barber & Morel Ltd; Neighborhood Legal, LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A.

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A.

Attorney's Signature: <u>/s/Paul J. Ripp</u>    Date: <u>November 19, 2025</u>

Attorney's Printed Name:  <u>Paul J. Ripp</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address:  <u>Williams Barber Morel Ltd., 233 S. Wacker Drive, Suite 6800, Chicago, IL 60606</u>

Phone Number: <u>312 443-3205</u>    Fax Number:  <u>312 630-8500</u>

E-Mail Address: <u>pjr@williamsbarbermorel.com</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-8021

Short Caption: Brandon Willis v. Universal Intermodal Services, Inc. et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Brandon Willis

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Williams Barber & Morel Ltd: Neighborhood Legal, LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A.

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A.

Attorney's Signature: /s/ Daniel R. Brown      Date: November 19, 2025

Attorney's Printed Name: Daniel R. Brown

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑   **No** ☐

Address: Williams Barber Morel Ltd., 233 S. Wacker Drive, Suite 6800, Chicago, IL 60606

Phone Number: 312 443-3206      Fax Number: 312 630-8500

E-Mail Address: drb@williamsbarbermorel.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................... i

TABLE OF AUTHORITIES .................................................. iii

JURISDICTIONAL STATEMENTS .............................................. 1

ISSUES PRESENTED ....................................................... 6

STATEMENTS OF THE CASE FOR EACH APPELLEE................................. 7

    A.  BIPA as Originally Enacted .................................. 7

    B.  Amended BIPA................................................ 8

    C.  Plaintiff-Appellee Claims and District Courts' Orders ...... 9

SUMMARY OF ARGUMENT ................................................... 15

ARGUMENT ............................................................. 17

  I.    THE BIPA AMENDMENT DOES NOT APPLY RETROACTIVELY............... 17

    A.  The Legislature Has Clearly Expressed that Amended BIPA Was Not Intended To Be Retroactive ............................... 18

    B.  The Plain Text of Illinois' Statute on Statutes Prohibits Retroactive Application of Amended BIPA................................... 22

    C.  Amended BIPA Cannot Apply Retroactively Because It Substantively Alters Rights and Liability................................... 23

      1.  Under Illinois Law, Substantive Amendments Are Prospective Only 24

      2.  Amended BIPA Substantively Changed the Law by Eliminating Accrued Rights of Action.................................. 25

      3.  Amended BIPA Is Not a Remedial Change Because It Alters When a Cause of Action Arises and Eliminates Accrued Claims.................. 28

      4.  Amended BIPA Alters Substantive Rights Because It Changes the Real-World Legal Consequences of Repeated Violations.................. 32

  II.    AMENDED BIPA IS NOT A CLARIFICATION BECAUSE IT CHANGES THE ACCRUAL OF CLAIMS ESTABLISHED IN *COTHRON*............................... 34

    A.  The Legislature Did Not Declare That It Was Clarifying BIPA.............. 35

    B.  Pre-Amended BIPA Was Not Ambiguous, as *Cothron* Held .................. 36

    C.  The Amendment Is Not Consistent With Any Reasonable Interpretation of Pre-Amendment BIPA or Its Legislative History ............................ 38

      1.  Amended BIPA Contradicts the Judicial Construction in *Cothron*... 38

      2.  The Legislative History Confirms that the Amendment Was a Change, Not a Clarification ....................................... 39

    D.  Because All Three *McGinnis* Factors Fail, Amended BIPA Is  Not  a Clarification...................................................... 39

III.  EVERY COURT TO CONSIDER THE QUESTION HAS CORRECTLY HELD THAT AMENDED BIPA DOES NOT APPLY RETROACTIVELY .................. 40

IV.  ILLINOIS SEPARATION-OF-POWERS PRINCIPLES INDEPENDENTLY FORBID RETROACTIVE LEGISLATIVE REVISION OF BIPA'S JUDICIALLY CONSTRUED MEANING ............................................................................ 42

V.  CONSTITUTIONAL AVOIDANCE BARS RETROACTIVE APPLICATION OF AMENDED BIPA ........................................................................................ 44

VI.  RETROACTIVITY IS A LEGAL QUESTION, NOT A POLICY DEBATE ....... 46

VII.  THE ILLINOIS SUPREME COURT WOULD RULE AGAINST RETROACTIVE APPLICATION OF AMENDED BIPA .......................................................... 47

**CONCLUSION** ............................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*Bates v. Bd. of Educ.*,
555 N.E.2d 1 (Ill. 1990) ............................................................................ 43

*Blocker v. Biomat USA, Inc.*, No. 24CV2676,
2024 U.S. Dist. LEXIS 240565 (N.D. Ill. Dec. 6, 2024) ............................. 41

*Caveney v. Bower*,
797 N.E.2d 596 (Ill. 2003) ......................................................................... 23

*City of Chicago v. Collin*,
134 N.E. 751 (Ill. 1922) ............................................................................. 45

*Comm. Bank of Trenton v. Schnuck Markets, Inc.*,
887 F.3d 803 (7th Cir. 2018) ...................................................................... 47

*Comm. Edison Co. v. Will Cty. Collector*,
749 N.E.2d 964 (Ill. 2001) ................................................................... 19, 20

*Cothron v. White Castle Sys.*,
216 N.E.3d 918 (Ill. 2023) ................................................................ *passim*

*Cothron v. White Castle Sys.*,
20 F.4th 1156 (7th Cir. 2021) ............................................................... 27, 32

*Dardeen v. Heartland Manor, Inc.*,
710 N.E.2d 827 (Ill. 1999) ......................................................................... 31

*Day-Brite Lighting, Inc. v. Missouri*,
342 U.S. 421 (1952) ................................................................................... 47

*Denius v. Dunlap*,
330 F.3d 919 (7th Cir. 2003) ...................................................................... 21

*First of Am. Trust Co. v. Armstead*,
664 N.E.2d 36 (Ill. 1996) ........................................................................... 45

*Foster Wheeler Energy Corp. v. LSP Equip., LLC*,
805 N.E.2d 688 (Ill. 2004) ......................................................................... 19

*Gagen v. Mandell Menkes, LLC*, No. 23L8294,
slip op. (Cook Cty. Cir. Ct. Oct. 2024) ....................................................... 41

*Giles v. Sabert Corp.*, No. 24CV2996,
     2025 U.S. Dist. LEXIS 12888 (N.D. Ill. Jan. 21, 2025) ...................... 4, 5, 41

*Goe v. Zucker*,
     43 F.4th 19 (2d Cir. 2022) ...................................................................... 21

*GreenPoint Mortgage Funding, Inc. v. Poniewozik*,
     23 N.E.3d 525 (Ill. App. 2014) ............................................................... 20

*Hassebrock v. Bernhoft*, No. 10CV679,
     2013 U.S. Dist. LEXIS 109399 (S.D. Ill. Aug. 5, 2013)) .............................. 2

*Hayen v. County of Ogle*,
     463 N.E. 2d 124 (Ill. 1984) ..................................................................... 47

*Illinois Bell Tel. Co. v. Fair Emp't Practices Comm'n*,
     407 N.E.2d 539 (Ill.1980) ....................................................................... 43

*In re Marriage of Cohn*,
     443 N.E.2d 541 (Ill. 1982) ..................................................................... 43

*Jones v. USP Chicago, Inc.*, No. 23CV16817,
     2025 U.S. Dist. LEXIS 101937 (N.D. Ill. May 29, 2025)........................... 41

*K. Miller Constr. Co. v. McGinnis*,
     938 N.E.2d 471 (Ill. 2010) ............................................................ *passim*

*Landgraf v. USI Film Products*,
     511 U.S. 244 (1994) ................................................................................ 19

*Maddux v. Blagojevich*,
     911 N.E.2d 979 (Ill. 2009) ..................................................................... 44

*Menominee Indian Tribe v. Thompson*,
     161 F.3d 449 (7th Cir. 1998) .................................................................. 21

*Middleton v. City of Chicago*,
     578 F.3d 655 (7th Cir. 2009) .......................................................... 34, 38

*People v. Atkins*,
     838 N.E.2d 943, 947 (Ill. 2005)....................................................25, 26, 29

*People ex rel. Alvarez v. Howard*,
     72 N.E.3d 346 (Ill. 2016) ....................................................................... 24

*People ex rel. Madigan v. J.T. Einoder, Inc.,*
   28 N.E.3d 758 (Ill. 2015) ............................................25, 27, 29-30, 33, 47

*People v. Glisson,*
   782 N.E.2d 251(Ill. 2002) ...................................................................... 30

*People v. Pullen,*
   733 N.E.2d 1235 (Ill. 2000) .................................................................... 23

*People v.* Rink,
   455 N.E.2d 64 (Ill. 1983) .............................................................43, 46, 48

*Perry v. Dep't of Fin. & Prof'l Regulation,*
   106 N.E. 3d 1016 (Ill. 2018) ........................................................... *passim*

*Pogorzelska* v. *VanderCook College of Music*, No. 19CV5683,
   2024 U.S. Dist. LEXIS 66011(N.D. Ill. Apr. 11, 2024) ........................ 30, 31

*Rojo v. Homer Tree Care, Inc.*, No. 23L8588,
   2024 Ill. Cir. LEXIS 1720 (Cook Cty. Cir. Ct. Oct. 2024) .......................... 41

*Rosenbach v. Six Flags Entertainment Corp.,*
   129 N.E.3d 1197 (Ill. 2019) ................................................................... 7, 8

*Roth v. Yackley,*
   396 N.E.2d 520 (Ill. 1979) ................................................................. 43, 44

*Schwartz v. Supply Network, Inc.*, No. 23CV14319,
   2024 U.S. Dist. LEXIS 213002 (N.D. Ill. Nov. 22, 2024) ....................... 5, 41

*Sykes v. Cook, Inc.,*
   72 F. 4th 195 (7th Cir. 2023) ................................................................. 4, 5

*Smith v. Hill,*
   147 N.E.2d 321 (1958) ............................................................................ 31

*Territory of Alaska v. Am. Can Co.,*
   358 U.S. 224 (1959). ............................................................................... 21

*Thomas v. Guardsmark, LLC,*
   487 F.3d 531 (7th Cir. 2007). ................................................................. 30

*Wallace v. Vee Pak, LLC*, No. 24L4560,
   2024 Ill. Cir. LEXIS 1719 (Cook Cty. Cir. Ct. Oct. 2024) .......................... 41

**Federal Statutes**

28 U.S.C. § 1292(b) ........................................................................ 3

28 U.S.C. § 1332 ................................................................... 1, 2, 3

**State Constitutional and Statutory Provisions**

Ill. Const. Art. II, § 1 ................................................................... 42

Illinois Public Act 103-0769 (2024) ............................... 4, 6, 13, 19

5 ILCS 70/4 ................................................................... *passim*

740 ILCS 14/1 *et seq.* ..................................................................... 1

740 ILCS 14/5 .................................................................................... 7

740 ILCS 14/15 .......................................................... *passim*

740 ILCS 14/20 ......................................................... 8-9, 26, 45

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ....................................... 24

Webster's Third New International Dictionary (2002) ...................... 24

Illinois General Assembly House Debate
    on Senate Bill 2979, May 16, 2024 ................................... 20, 36

Illinois General Assembly Senate Debate
    on Senate Bill 2979, April 11, 2024 .............................. 21, 35-36

# JURISDICTIONAL STATEMENTS

_Clay v. Union Pacific Railroad Company_, Case No. 25-2185

Union Pacific Railroad Company's ("Union Pacific") jurisdictional statement is complete and correct. Mr. Clay is a citizen of Illinois.

_Willis v. Universal Intermodal, Inc. et al._, Case No. 25-2761

On March 30, 2021, Plaintiff-Appellee Brandon Willis ("Willis") filed a putative class action complaint in the Northern District of Illinois alleging that his former employer, Universal Intermodal Services, Inc. ("UIS"), had violated Sections 15(a), (b), (d) and (e) of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 _et seq._ UIS A43–A53.[1]

Willis is a citizen of the state of Illinois and UIS is a Michigan corporation with its principal place of business in Warren, Michigan. UIS A44. Willis's claimed damages exceeded $75,000 as he sought an award of liquidated damages for each of numerous alleged violations of the Act. UIS A44–A45. Accordingly, jurisdiction was proper pursuant to 28 U.S.C. §1332(a).

Willis filed an amended complaint on August 29, 2023, adding four new defendants: Universal Logistics Holdings, Inc. ("ULH"), Universal Management Services, Inc. ("UMS"), HR-1 LLC ("HR-1") and Data System Services LLC ("DSS"). UIS A64–A97. At the time of filing, ULH and UMS were Michigan corporations

---

[1] Citations beginning with "UP," "ULH," and "CT" refers to pages of the Briefs, Appendices, or District Court Docket Numbers for Union Pacific, UIS _et al._, and Central Transport, respectively. Citations to "JSA#" refer to the Joint Supplemental Appendix filed herewith.

with their principal place of business in Warren, Michigan.[2] UIS A66. HR-1 and DSS are both Michigan limited liability companies with their principal place of business in Warren, Michigan, and no members are citizens of Illinois. UIS A66.

Complete diversity exists because Willis is a citizen of Illinois, and none of the Defendants is a citizen of Illinois. The amended complaint alleges numerous violations such that the amount in controversy for Willis's individual claim exceeds $75,000. UIS A67. The amended complaint thus alleges subject matter jurisdiction under 28 U.S.C. §1332(a).

For the class claims: a) the amount in controversy exceeds $5,000,000; b) there are an estimated more than 100 putative class members; c) at least one class member is a citizen of a state (Illinois) different from at least one of the Defendants' state of citizenship (Michigan); and d) none of the exceptions under section 1332(d) apply. UIS A67. The amended complaint thus alleges subject matter jurisdiction under 28 U.S.C. §1332(d).

On July 14, 2025, the district court certified the issue presented below for interlocutory appeal. UIS A1–A6. Defendants filed a timely Petition for Permission to Appeal on July 23, 2025, which this Court granted on September

---

[2] Diversity citizenship is determined at the "time of filing" and "changes in the parties' citizenship later, during the lawsuit, will not divest the court of jurisdiction." *Hassebrock v. Bernhoft*, No. 10-CV-679-WDS, 2013 U.S. Dist. LEXIS 109399, at *5 (S.D. Ill. Aug. 5, 2013) In addition, ULH changed its state of incorporation from Michigan to Nevada. *See* https://mibusinessregistry.lara.state.mi.us/search/business (viewed on Nov. 18, 2025.) Thus, ULH is still diverse from Plaintiff Brandon Willis.

18, 2025. Case No. 25-8021, Dkt. Nos. 1, 8. The Court thus has appellate jurisdiction under 28 U.S.C. §1292(b).

<u>Gregg v. Central Transport, LLC</u>, Case No. 25-2762

The jurisdictional summary in the Appellant's Brief is not complete and correct. Diversity subject-matter jurisdiction exists under 28 U.S.C. § 1332(a)(1) because there is complete diversity among the parties and the amount in controversy exceeds $75,000, excluding interest and costs.

Plaintiff-Appellee John Gregg ("Gregg") is a citizen of Illinois. CT A9 (Dkt. 1 ¶4). Defendant-Appellant Central Transport LLC ("Central Transport") admits to being a Michigan limited liability company with its principal place of business in Illinois. CT Brf. at 1. Central Transport further concedes "[t]he amount in controversy would exceed $75,000 when the lawsuit was filed if [Gregg's] theory of damages were correct" because the Complaint alleged more than enough BIPA scan violations to exceed the amount-in-controversy requirement. *Id.* at 2-3.

Gregg's First Amended Complaint ("Complaint") alleges that Central Transport violated Section 15(b) of BIPA, 740 ILCS 14/15(b), by collecting or capturing his biometric identifier or biometric information, and violated Section 15(d) of BIPA, 740 ILCS 14/15(d), by disclosing, redisclosing, or otherwise disseminating his biometric identifier or biometric information, without first obtaining his written informed consent in accordance with the Act's requirements. The Complaint asserts that from October 1, 2023 until October 31, 2023, while working for Central Transport, Gregg was required to scan his fingerprint or hand geometry no less than four times each day (each time he

began and ended his working day, as well as each time he clocked in and out for breaks). CT A24 ¶¶16-17. The Complaint seeks statutory liquidated damages of $1,000 for each negligent violation and $5,000 for each reckless or intentional violation and alleges that there were not less than 75 BIPA violations. CT A23, n.1. Central Transport does not present any contrary proofs.

Gregg's Complaint was filed on May 10, 2024. CT A22. Illinois Public Act 103-0769 was later enacted on August 2, 2024 and became effective upon becoming law. CT Brf. at 2; CT F4.

Federal subject-matter jurisdiction would still be present even if Defendant prevails on its appeal. It was not "impossible" "as a matter of state damages law" for Gregg "to recover more than $75,000 based on" his "alleged injuries at the time of filing." *Sykes v. Cook, Inc.*, 72 F. 4th 195, 207 (7th Cir. 2023) (citations omitted). Under *Sykes*, the court "assess[es] the amount in controversy as of the date on which the case is filed in or removed to federal court." *Id.* at 205 (citations omitted). At the time of filing, Gregg "alleged in good faith that more than $75,000 was at stake in h[is] case." *Id.* at 207. On that date, "the controlling law concerning the accumulation of damages under Sections 15(b) and 15(d) of BIPA was *Cothron v. White Castle Systems, Inc.*, 2023 IL 128004, 466 Ill. Dec. 85, 216 N.E.3d 918 [(Ill. 2023)]." *Giles v. Sabert Corp.*, No. 24CV2996, 2025 U.S. Dist. LEXIS 12888, at *8 (N.D. Ill. Jan. 21, 2025). *Cothron* had held that BIPA's text unambiguously provides that each violation constitutes a distinct actionable claim for which separate liquidated damages may be awarded. *See* 216 N.E.3d at 923-24, 926, 929. *Cothron* also ruled that liquidated damages are potentially

available for each separate claim. *See id.* at 928-29. Because such damages were awardable under controlling authority as of the date that Gregg filed his Complaint, federal subject-matter jurisdiction exists under *Sykes. See Giles,* 2025 U.S. Dist. LEXIS 12888, at *7-12 (citing, *inter alia, Sykes,* 72 F. 4th at 205-06; *Schwartz v. Supply Network, Inc.*, No. 23CV14319, 2024 U.S. Dist. LEXIS 213002, at *14 (N.D. Ill. Nov. 22, 2024)).

**ISSUES PRESENTED**

1.     Whether the changes to the Biometric Information Privacy Act enacted by Illinois Public Act 103-0769 ("Amended BIPA") modified substantive law by limiting a plaintiff to a single claim for multiple violations of BIPA that, under the original statute, entitled a plaintiff to a separate claim for each of the multiple violations, such that the amendment applies prospectively only to claims arising on or after the effective date of August 2, 2024.

2.     Whether the modifications to set forth in Amended BIPA qualify as a mere clarification of existing law that overcomes the presumption that an amendment changes the law where the original statute is unambiguous; the legislature expressed its intent to change the law; and the amendment is inconsistent with the plain language and the Illinois Supreme Court's interpretations of the original statute.

3.     Whether the separation of powers doctrine under the Illinois Constitution precludes the legislature from annulling the effect of the Illinois Supreme Court's *Cothron* decision by barring a plaintiff's separate claims for each violation of Section 15(a) and 15(b).

Not all Appellants have raised the same grounds for reversal of the district court's decisions in their respective cases but have collectively raised arguments in this appeal for reversal that relate to each of the foregoing statement of issues. Appellant Union Pacific did not present or join an argument relating to Issue 2.

**STATEMENTS OF THE CASE FOR EACH APPELLEE**

This appeal consists of consolidated interlocutory appeals in *Clay v. Union Pacific Railroad Co.,* Case No. 25-2185, *Willis v. Universal Intermodal Services, Inc. et al.*, Case No. 25-2761, and *Gregg v. Central Transport, LLC,* Case No. 25-2762. All three cases seek to reverse district court rulings holding that Amended BIPA does not apply to cases filed and pending at the time the amendment took effect on August 2, 2024.

## A. BIPA as Originally Enacted

In 2008, the Illinois General Assembly enacted BIPA to address concerns regarding the use and collection of biometrics. BIPA set forth legislative findings providing, *inter alia*: that because biometrics are "unique to the individual; therefore, once compromised, the individual has no recourse [and] is at heightened risk for identity theft;" that "[t]he full ramifications of biometric technology are not fully known;" and that "[t]he public welfare . . . will be served by regulating . . . biometric identifiers and information." 740 ILCS 14/5(c), (f), (g). To serve these purposes, BIPA established a private right of action to "[a]ny person aggrieved by a violation of [the] Act" and further provides that "a prevailing party may recover for each violation: . . . liquidated damages of $1,000 or actual damages," attorneys' fees, and costs, and other appropriate relief. 740 ILCS 14/20(a).

The Illinois Supreme Court construed BIPA in its original form to find that (1) Section 20 permits a claim for statutory damages for each violation without proof of actual damages, *Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197,

1206-1207 (Ill. 2019); and (2) "a separate claim accrues under the Act each time a private entity scans or transmits an individual's biometric identifier or information in violation of section 15(b) or 15(d)," *Cothron*, 216 N.E.3d at 920.

*Cothron* expressly acknowledged that because "a party may recover for 'each violation,'" applying BIPA's clear language could expose defendants to large damage awards for multiple violations. *Cothron*, 216 N.E.3d at 928. *See also Rosenbach*, 129 N.E. 3d at 1206 (BIPA sought to "head off" problems by imposing "substantial potential liability . . . 'for each violation'"). BIPA nonetheless reflects legislative intent to "provide[] an incentive for private entities that collect biometric information to take action to mitigate their conduct if they neglected to comply at first." *Cothron*, 216 N.E.3d at 923. Policy concerns regarding multiple claims for multiple violations would require legislative action. *Id.* at 929.

## B.   Amended BIPA

After *Cothron*, the Illinois General Assembly amended BIPA Section 20 so that it now states:

**740 ILCS 14/20 Right of Action.**

**(a)** Any person aggrieved by a violation of this Act shall have a right of action in a State circuit court or as a supplemental claim in federal district court against an offending party. A prevailing party may recover for each violation:

**(1)** against a private entity that negligently violates a provision of this Act, liquidated damages of $1,000 or actual damages, whichever is greater;

**(2)** against a private entity that intentionally or recklessly violates a provision of this Act, liquidated damages of $5,000 or actual damages, whichever is greater;

**(3)** reasonable attorneys' fees and costs, including expert witness

fees and other litigation expenses; and

**(4)** other relief, including an injunction, as the State or federal court may deem appropriate.

**(b)** For purposes of subsection (b) of Section 15 [740 ILCS 14/15], a private entity that, in more than one instance, collects, captures, purchases, receives through trade, or otherwise obtains the same biometric identifier or biometric information from the same person using the same method of collection in violation of subsection (b) of Section 15 has committed a single violation of subsection (b) of Section 15 for which the aggrieved person is entitled to, at most, one recovery under this Section.

**(c)** For purposes of subsection (d) of Section 15, a private entity that, in more than one instance, discloses, rediscloses, or otherwise disseminates the same biometric identifier or biometric information from the same person to the same recipient using the same method of collection in violation of subsection (d) of Section 15 has committed a single violation of subsection (d) of Section 15 for which the aggrieved person is entitled to, at most, one recovery under this Section regardless of the number of times the private entity disclosed, redisclosed, or otherwise disseminated the same biometric identifier or biometric information of the same person to the same recipient.

The amendment added Subsections 20(b) and 20(c) as wholly new provisions. They change an aggrieved person's right of action "for each violation" under BIPA in its original form to only "a single violation" against a private entity that violates Section 15(b) and 15(d), "for which the aggrieved person is entitled to, at most, one recovery under" subsection (b), and (d), of Section 15. *Id.*

### C.   Plaintiff-Appellee Claims and District Courts' Orders

<u>*Clay v. Union Pacific Railroad Company*</u>, Case No. 25-2185

Plaintiff-Appellee Reginald Clay is a commercial truck driver that visited Union Pacific's facilities between 2019 and 2024 and used biometric scanners at those facilities hundreds of times. UP A19 ¶¶4-6. Clay alleges that Union Pacific

9

violated Section 15(b) by scanning and collecting his fingerpints each of the times he visited Union Pacific Facilities. UP A23 ¶34. He seeks damages for each of Union Pacific's violations of Section 15(b). UP A24.

Union Pacific filed a motion for summary judgment to limit Clay's claims and damages to a single violation under Amended BIPA. UP A7, Dkt. No. 37. The District Court denied Union Pacific's motion. UP A1-A2. The District Court certified the issue for appeal pursuant to 28 U.S.C. § 1292(b). UP A9, Dkt. No. 65. Union Pacific's petition was granted by this Court. Case No. 25-8011, Dkt. No. 8.

*Willis v. Universal Intermodal, Inc. et al.*, Case No. 25-2761

Plaintiff-Appellee Brandon Willis filed a putative class action in 2021 against UIS. He filed an amended complaint in August 2023 to add four defendants and alleged violations of Sections 15(a), (b), (d) and (e).

In 2019, Willis was required enroll in a time keeping system that used a fingerprint scanner. UIS A64 ¶1. Wills and other workers' biometrics were captured when they first scanned their fingerprints into the system which converted the scan into a template (or biometric information) for storage on an electronic database. *Id.* ¶2. Thereafter, workers clocked in and our using devices that scanned their fingerprints and compared each new fingerprint scan to the information on the database. *Id.*

Willis claims that UIS and ULH, the parent of UIS, for itself and through ULH agents are liable for repeatedly violating BIPA Sections 15(b) and 15(d) by collecting and disseminating the biometrics of Willis and a class of similarly

situated individuals without consent. UIS A93-A94. These violations occurred numerous times at several facilities of ULH subsidiaries during initial enrollment, during transfer of data to and from different entities, and when putative class members used the scanners on a daily basis. UIS A64-A66.

Plaintiff also brings class claims under Section 15(a) and 15(e) because UIS *et al.* failed to publish and comply with a written retention policy and failed to adequately secure biometric identifiers and information. UIS A92, A94.

On November 27, 2024, Defendant UIS filed a motion for summary judgment to limit Willis and the putative class members to a single claim under Amended BIPA. UIS A98-A102. Willis cross-moved for summary judgment for an order holding that the amendment to BIPA does not apply to Willis's or the putative class members' claims. UIS A103-A107. The District Court denied UIS's motion and granted Willis's motion. UIS A110. The Court's order relied on its analysis in *Gregg II*, discussed below, and several court opinions in both state and federal court holding that the amendments to BIPA applied prospectively only. *Id.*

<u>*Gregg v. Central Transport, LLC*, Case No. 25-2762</u>

Plaintiff-Appellee John Gregg was employed by Central Transport at its Hillside, Illinois facility from October 1, 2023 until October 31, 2023. CT Dkt. 1, CT A10 ¶5. While working for Central Transport, Gregg was required to use a biometric timeclock no fewer than four times per working day—each time he began and ended his working day and each time he clocked in and out for breaks. CT A10 ¶¶15-17. Every time he did so, his biometrics were scanned, analyzed,

and converted into digital information that was transmitted to and compared with a database to find a matching copy or template; once a match was found, it authenticated Gregg's identity and the time of the scan was recorded. CT A10 ¶¶17-19. Central Transport's biometric system was used for employee identification, authentication, and to track employee time worked. *Id.* ¶19.

Central Transport failed to inform Gregg of the specific limited purposes for which it collected, stored, or used Gregg's biometrics, never informed him of the specific length of time for which it would use or retain his biometrics, and never obtained a signed written release from Gregg allowing Central Transport to collect, capture, or otherwise obtain his biometrics. CT A11 ¶¶ 23-25. Additionally, on information and belief, Central Transport did not have a data retention and destruction policy during this time period. *Id.* ¶26.

Central Transport thereby violated Section 15(a) of BIPA by collecting and possessing Gregg's biometric identifier or biometric information while using it for the purpose of identifying him, without having a retention schedule or guidelines in place for permanently destroying biometric information as specified by BIPA and without complying with BIPA and Central Transport's policies' retention and destruction requirements. CT A14-A16 Count I. Central Transport also thereby violated Section 15(b) of BIPA each time Central Transport collected, captured, or otherwise obtained Gregg's biometric identifier or biometric information each time it scanned Gregg's fingerprint or hand geometry without obtaining Gregg's prior written informed consent. CT A16-A18 Count II. And Central Transport further violated Section 15(d) of BIPA by disclosing, redisclosing, or otherwise

disseminating Gregg's biometric identifier and biometric information to ADP without first obtaining Gregg's prior written informed consent. CT A19-A21 Count III.

On November 13, 2024, Judge Bucklo granted Central Transport's motion to dismiss for lack of subject-matter jurisdiction. CT A37-A46 ("*Gregg I*"). The court rejected contentions that "some aspects of PA 103-0769 are inconsistent with *Cothron's* holding that multiple collections or disseminations of the same biometric identifiers or information are each separate violations." CT A43. The court did not find it necessary to "address those concerns because the dispositive point remains as to the issue of damages: by inviting the legislature to 'clarify' the issue of damages, the Illinois Supreme Court endorsed the view that the issue was unsettled and that the legislature could permissibly settle it." CT A43-A44.

The court concluded that Amended BIPA met the test for establishing it as "a clarification of the prior statute" that "must be accepted as a legislative declaration of the meaning of the original Act." CT A40-A44. It determined that, "[a]ccordingly, the clarified intent on PA 103-0769 must be applied as if it were clear from the date of BIPA's enactment" and ruled that, as a result, Gregg's claims were limited to a single claim under each of Section 15(b) and 15(d) that "[t]ogether, [] amounts to a maximum recovery of $15,000 . . . ." *Id.* at CT A43-A44. The court dismissed the action for lack of subject-matter jurisdiction, holding that the amount in controversy fell below the jurisdictional threshold of $75,000. *Id.* The court reconsidered and vacated the holding in *Gregg I* on

grounds of "manifest error." CT A2-A6 ("*Gregg II*"). Judge Bucklo explained that *Greg I* was wrongly decided because it construed the amendment too narrowly as a mere clarification of the "recovery available for *a violation*." CT A5 (emphasis added). Properly construed, the court found the that Amended BIPA modified the law because it changed "what constitutes a 'violation.'" *Id.* The court recognized that because *Cothron* holds that "a separate claim accrues . . . each time a private entity scans or transmits an individual's [biometrics]," Amended BIPA's limiting of claims to "a single violation" created an "inherent conflict" with *Cothron. Id.*

## SUMMARY OF ARGUMENT

Amended BIPA does not apply retroactively. The General Assembly intended it would not be retroactive. Amended BIPA contains no language indicating it is retroactive, and both of its sponsors stated during the floor debates on the bill that the amendment "will not be retroactive," "does not affect any pending or past cases," and includes no "retroactivity provision." When the legislature considers retroactivity and expressly declines to adopt it, Illinois courts give effect to that choice.

Independently, Section 4 of the Statute on Statutes forecloses retroactive application. Section 4 prohibits applying a statutory change to "rights accrued" unless the legislature unmistakably provides otherwise. It is undisputed that the amendment contains no such directive. Under controlling Illinois Supreme Court precedent, that ends the inquiry. Illinois law does not permit retroactive erasure of accrued liability. A cause of action is an accrued claim the moment it arises under existing law, and Section 4 prohibits legislation from extinguishing accrued rights after the fact.

Amended BIPA is also a change in substantive law. Before the amendment, each nonconsensual scan or transmission accrued as a separate claim. The amendment collapses multiple violations into a single claim, extinguishing the accrued causes of action that previously arose with each unlawful scan or transmission after the first. That is a change in whether a claim arises at all, not an adjustment to procedure or remedies. Under Illinois law, an amendment that alters the existence, accrual, or scope of a cause of action is substantive and

cannot reach past conduct. The amendment does not change the measure of damages; the statutory damages provision is unchanged. What it changes is the existence of the claim itself.

Nor is the amendment a "clarification." *Cothron* applied unambiguous statutory text, and an amendment that contradicts a definitive judicial construction cannot be retroactively recast as a clarification. Pre-amendment BIPA was not ambiguous; the Illinois Supreme Court held exactly what the statute meant and when claims accrued. The legislative history confirms the point: the sponsors described the amendment as a change and rejected a retroactive provision. All three factors from *K. Miller Construction Co. v. McGinnis,* 938 N.E.2d 471 (Ill. 2010) therefore fail.

Every court to offer an opinion on the issue has ultimately rejected retroactivity. Courts across Illinois and federal district courts applying Illinois law have all held that the amendment cannot apply to past conduct. Their conclusions reflect the same reasoning set out above.

Illinois separation-of-powers doctrine independently bars retroactive application. Once the Illinois Supreme Court definitively construes a statute, the legislature cannot "retroactively" alter that construction or "annul" accrued claims without violating the Illinois Constitution's allocation of judicial power. Retroactively applying the amendment would do precisely that.

The canon of constitutional avoidance leads to the same result. Retroactively extinguishing accrued causes of action raises the same constitutional concerns as retroactively imposing liability; both impair rights

that accrued under existing law—the very category Section 4 protects from retroactive impairment. When an interpretation would create such constitutional problems, Illinois courts adopt the alternative reading—in this case, prospective-only application.

Policy concerns cannot override clear text, established doctrine, or constitutional limits. And for all these reasons, the Illinois Supreme Court—applying Section 4, *Cothron*, its substantive-change cases, and the legislature's express statements—would hold that Amended BIPA governs prospectively only.

## ARGUMENT

## I. THE BIPA AMENDMENT DOES NOT APPLY RETROACTIVELY

Under Illinois law, statutory amendments are presumed to operate prospectively only. The Illinois Supreme Court reaffirmed this principle in *Perry v. Department of Financial & Professional Regulation*, 106 N.E. 3d 1016, 1026 (Ill. 2018), explaining that "where the legislature has not expressly indicated its intent as to temporal reach, a presumption arises that the amended statute is not to be applied retroactively." (Citation and quotation marks omitted). This presumption is codified in Section 4 of the Statute on Statutes, which provides that "[n]o new law shall be construed to repeal a former law . . . as to any right accrued, or claim arising under the former law." 5 ILCS 70/4. The rule is not discretionary. It reflects the legislature's intent and the separation-of-powers principle that courts may not create a retroactive effect in the absence clear legislative direction.

Applying that framework, Amended BIPA cannot be applied retroactively

for three independent reasons. First, the legislature expressly declined to make the amendment retroactive. Amended BIPA contains no language indicating that it is retroactive, and the legislative history shows that retroactive application was considered and rejected. That resolves the issue. Second, even if the legislature had not expressed its intent, the presumption of prospective application would still control. The burden rests on those seeking retroactive application to overcome that presumption, and Illinois courts "need not go beyond" Section 4 when the legislature has not clearly spoken. The plain text of Section 4 forbids applying an amendment to extinguish "any right accrued, or claim arising under the former law," which is exactly what applying Amended BIPA retroactively would do. Third, eliminating accrued claims is a substantive change in the law. Under controlling Illinois precedent, substantive amendments—those that alter rights or liabilities—cannot be applied retroactively unless the legislature expressly says so.

Every court to opine on this issue has reached the same final conclusion: Amended BIPA does not apply retroactively. The Appellants in these cases (collectively the "Defendants") identify no reason for this Court to depart from that settled consensus.

### A. The Legislature Has Clearly Expressed that Amended BIPA Was Not Intended To Be Retroactive

To determine retroactivity, the Illinois Supreme Court mandates that courts look first at whether "the legislature has clearly indicated the temporal reach" of a statutory amendment, in which case "such temporal reach must be given effect unless to do so would be constitutionally prohibited." *Perry*, 106

N.E.3d at 1026-1027 (citing *Commonwealth Edison Co. v. Will Cty. Collector*, 749 N.E.2d 964, 974 (Ill. 2001)). Here, the legislature clearly indicated the temporal reach of Amended BIPA by not including express language that it is to be applied retroactively, as confirmed in its legislative history.

"[T]he legislature is undoubtedly aware of how to clearly indicate its intent that a statute apply to causes of action currently pending in the courts." *Id.* at 1033 (collecting cases). Consequently, "the legislature *always* will have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes." *Id.* at 1027 (emphasis in original; internal quotation marks and citations omitted).

Here, the amendment contains a statement of its temporal reach that does not expressly indicate that it is retroactive: "This Act takes effect on becoming law." P.A. 103-0769, § 99. In *Foster Wheeler Energy Corp. v. LSP Equip., LLC*, the Illinois Appellate Court concluded that "[s]tatutes that merely provide that they are to 'take[] effect upon becoming law[]' . . . do not contain a clear expression of legislative intent that they are to be applied retroactively." 805 N.E.2d 688, 694 (Ill. Ct. App. 2004) (second alteration in original) (reviewing an amendment with an effective date that "[t]his act takes effect upon becoming law," 815 ILCS 665/99).

*Perry* further recognizes that "Illinois' retroactivity jurisprudence" has been "convoluted and muddled" in its "evolution," and that ultimately Illinois "adopted the United States Supreme Court's retroactivity analysis as set forth in *Landgraf* [*v. USI Film Products*, 511 U.S. 244 (1994)]." *Id.* (citing *Commonwealth*

*Edison*, 749 N.E.2d at 972). *Landgraf* allows courts to examine and rely on the legislative history for whether it provides a clear indication of the legislature's intent on retroactivity. 511 U.S. at 249 ("the relevant legislative history of the [] Act reinforces our conclusion" on retroactivity); *see also Perry*, 106 N.E.3d at 1026 ("Under step one of *Landgraf*, . . . [i]f the legislature has clearly indicated the temporal reach, then such temporal reach must be given effect unless to do so would be constitutionally prohibited."); *GreenPoint Mortgage Funding, Inc. v. Poniewozik*, 23 N.E.3d 525, 531 (Ill. Ct. App. 2014) (reviewing legislative history to "resolve" whether an amendment "was intended to apply retroactively or prospectively.").

The amendment's legislative history confirms the legislature's intent that Amended BIPA is not retroactive. The House debate on Senate Bill 2979, the bill containing the BIPA amendment, leaves no doubt that the General Assembly intended the amendment to operate prospectively only. When directly asked whether the bill included "any retroactivity involved in the language," bill sponsor Representative Williams unequivocally responded: "We are not including a retroactivity provision." JSA 5. Later, Representative Didech sought confirmation about the amendment's retroactivity, asking, "Does this Amendment to the Act apply retroactively to cases already decided or to pending cases?" Representative Williams gave the same clear answer: "No, but a court or reviewing court could take judicial notice of our Amendment to the Act in determining an initial award or in reducing an award." JSA 9. These exchanges occurred during formal questioning on the House floor and directly addressed the issue of retroactivity.

The sponsor's repeated, categorical statements that the bill did not apply retroactively—without any qualification or dissent from other members—reflect express legislative intent that Amended BIPA would govern only prospectively.

The same clarity appears in the Senate debate, where chief sponsor Senator Cunningham directly stated that the amendment was not retroactive. When asked whether "this amendment to [BIPA] appl[ies] retroactively to cases already decided or to pending cases," Senator Cunningham stated, "No but a court . . . could take judicial notice of our amendment . . . in determining an initial award or in reducing an award." JSA 19, JSA 39.[3] This direct assurance from the Senate sponsor—the member charged with presenting and defending the bill—leaves no ambiguity about legislative intent. The Senate understood and expressly stated that Amended BIPA would govern only prospectively, preserving all accrued and pending claims under the pre-amendment statute.

The legislature's election not to provide for retroactive application in the text of the amendment—combined with the presumption against retroactivity and the floor debates in both the House and the Senate confirming that the amendment is

_____

[3] During briefing in the district court, plaintiffs relied on an unofficial transcript of the Senate proceedings. JSA 14-35. In addition, an excerpt obtained from https://ilga.gov/Documents/Senate/transcripts/Strans103/10300097.pdf, the Senate transcript on the General Assembly website is filed herewith. JSA 36-46. "Judicial notice may be taken at any time, including on appeal." *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (citing Fed. R. Evid. 201(f)). Further, "[j]udicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper." *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (collecting cases); *see also Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022) ("[A]s a fundamental matter, courts may take judicial notice of legislative history.") (citing *Territory of Alaska v. Am. Can Co.,* 358 U.S. 224, 226-27 (1959)).

not retroactive—amounts to a clear statement of legislative intent and must be followed by the courts.

**B.     The Plain Text of Illinois' Statute on Statutes Prohibits Retroactive Application of Amended BIPA**

If the Court concludes that the legislature's expressed intent regarding retroactivity is not clear, "then the legislature's intent as to temporal reach is provided by default in section 4" of the Statute on Statutes. *Perry*, 106 N.E.3d at 1026. Section 4 provides, in relevant part, as follows:

> No new law shall be construed to repeal a former law . . . as to any act done . . . or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done . . . or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding.

5 ILCS 70/4. This statutory language is categorical: a new law cannot repeal a former law in a way "to affect . . . any right accrued" or a "claim arising under the former law." *Id.*

If applied retroactively, Amended BIPA does exactly what Section 4 prohibits, extinguishing claims that arose and rights that fully accrued under pre-amendment BIPA, based on acts that predate the amendment. Under Illinois law, "a claim accrues under [pre-amendment BIPA] with every scan or transmission of biometric identifiers or biometric information without prior informed consent." *Cothron*, 216 N.E.3d at 929. Because each unlawful scan or dissemination constitutes "a separate claim," *id.* at 920, all of the claims relevant to these appeals—based entirely on scans or transmissions that occurred before the BIPA amendment's effective date—were fully accrued under the pre-

22

amendment statute. Once a claim has accrued, Section 4 of the Statute on Statutes protects it from extinguishment by later legislation. Applying Amended BIPA to bar or limit those preexisting claims would "affect [a] right accrued" within the meaning of Section 4, directly contravening the legislature's own prohibition on retroactive impairment of accrued rights.

This prohibition is not a mere interpretive presumption—it is a clear and direct legislative command about temporal reach. *Perry*, 106 N.E.3d at 1026-27. Where the legislature uses such unmistakable phrasing, courts are bound to apply it as written. As the Illinois Supreme Court has explained, "[t]he language of the statute must be given its plain and ordinary meaning, and where the statutory language is clear and unambiguous, we have no occasion to resort to aids of construction." *People v. Pullen*, 733 N.E.2d 1235, 1238 (Ill. 2000).

The unambiguous language of Section 4 thus requires that Amended BIPA operate only prospectively. *See Perry*, 106 N.E.3d at 1026-27.

### C. Amended BIPA Cannot Apply Retroactively Because It Substantively Alters Rights and Liability

Amended BIPA cannot be applied retroactively under Section 4 because it makes a substantive change in the law. Illinois law draws a sharp line: amendments "that are procedural in nature may be applied retroactively, while those that are substantive may not." *Caveny v. Bower*, 797 N.E.2d 596, 601 (Ill. 2003). As *Perry* explains, when the legislature has not expressly indicated an amendment's temporal reach, courts determine whether the change is procedural or substantive, and "[o]ur focus is still upon discerning 'legislative intent.'" 106 N.E.3d at 1028 (collecting cases).

Amended BIPA easily qualifies as substantive. It does not alter any procedural step in litigation. Instead, it changes the circumstances under which a cause of action arises and limits the causes of action that existed under pre-amendment BIPA. That change alters the scope of liability and the legal consequences of past conduct. Under Section 4, such amendments are substantive and therefore may operate only prospectively.

### 1. Under Illinois Law, Substantive Amendments Are Prospective Only

Illinois precedent provides a consistent framework. Substantive amendments are those that affect the existence or scope of rights and liabilities, while procedural amendments govern only the means by which those rights are enforced. *Perry* reaffirmed that distinction, stating that "procedural changes to statutes will be applied retroactively, while substantive changes are prospective only." 106 N.E.3d at 1027 (quoting *People ex rel. Alvarez v. Howard*, 72 N.E.3d 346, 352 (Ill. 2016)).

In doing so, *Perry* relied on definitions that underscore the point. "'Substantive law' is . . . '[t]he part of the law that creates, defines, and regulates the rights, duties, and powers of the parties,'" and it "determines when a cause of action for damages or other relief has arisen." *Id.* at 1034 (quoting Black's Law Dictionary 1658 (10th ed. 2014) and Webster's Third New International Dictionary 2280 (2002)). By contrast, "procedural law" consists of "[t]he rules that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves." *Id.* (quoting Black's Law Dictionary 1398 (10th ed. 2014)).

Other Illinois decisions apply the same distinction in the retroactivity context. In *People v. Atkins*, the court explained that "[s]ubstantive law . . . establishes the rights whose invasion may be redressed through a particular procedure," and warned that "procedural ramifications of a substantive amendment do not make the amendment procedural." 838 N.E.2d 943, 947, 948 (Ill. 2005) (citations omitted). Likewise, in *People ex rel. Madigan v. J.T. Einoder, Inc.*, the court held that an amendment to the Environmental Protection Act was substantive—and thus could not apply retroactively—because it "creates an entirely new type of liability . . . which was not available under the prior statute" and would "impose a new liability on defendants' past conduct" if applied to earlier events. 28 N.E.3d 758, 766-767 (Ill. 2015).

Taken together, these decisions establish the governing rule of Section 4: when an amendment changes who can be held liable, for what conduct, and under what causes of action, it is substantive. Such amendments may not be applied to past conduct absent an unmistakable legislative directive. As explained above, there is no such directive here. Amended BIPA therefore cannot be retroactively enforced if it alters rights or liabilities—which it plainly does.

### 2. Amended BIPA Substantively Changed the Law by Eliminating Accrued Rights of Action

Under pre-amendment BIPA, each nonconsensual scan or transmission of biometric data created a separate statutory violation and a separate statutory claim. The Illinois Supreme Court held that "a claim accrues under [pre-amendment BIPA] with every scan or transmission of biometric identifiers or biometric information without prior informed consent," and that each instance

is "a separate claim." *Cothron*, 216 N.E.3d at 920, 929. The Illinois Supreme Court's interpretation of claim accrual under pre-amendment BIPA was not ambiguous. It was the controlling construction of the statute and binding on all courts.

Amended BIPA rewrites that rule. It provides that multiple scans or transmissions "using the same method of collection" constitute a "single violation" for which "the aggrieved person is entitled to, at most, one recovery." 740 ILCS 14/20(b). That change collapses what were previously dozens, hundreds, or thousands of accrued violations and claims into a single violation and claim. For all repeated violations after the first, the amendment eliminates the right to sue altogether.

That change is substantive under every Illinois retroactivity framework. A cause of action is what makes a statutory right enforceable. Before the amendment, each unlawful scan gave rise to a separate accrued cause of action; after the amendment, those causes of action disappear. Illinois law treats the *existence* of a cause of action—not the litigation procedures used to pursue it— as a matter of substantive law. As *Atkins* explains, "[s]ubstantive law . . . establishes the rights whose invasion may be redressed through a particular procedure," and "procedural ramifications of a substantive amendment do not make the amendment procedural." 838 N.E.2d at 947-948 (citations omitted). And under *Perry*, substantive law "creates, defines, and regulates the rights, duties, and powers of the parties" and determines "when a cause of action for damages or other relief has arisen." 106 N.E. 3d at 1033-1034(citations omitted).

Amended BIPA does exactly that: it redefines when a cause of action "has arisen." Where pre-amendment BIPA made each scan a new actionable invasion of privacy, the amendment eliminates that right of action for every violation after the first. That is not a modification of procedure or remedy. It is a change in the existence of enforceable rights.

The Illinois Supreme Court's decision in *J.T. Einoder* confirms the point. There, the Court held that an amendment was substantive—and could not apply retroactively—because it "creates an entirely new type of liability . . . which was not available under the prior statute," and would "impose a new liability on defendants' past conduct" if applied to earlier acts. 28 N.E.3d at 766-767. The same principle bars retroactive application here. Whether a statute adds new liability or eliminates existing liability, the effect is the same: it changes the legal consequences of past conduct. Amended BIPA removes liability for repeated scans that were unquestionably actionable when they occurred by collapsing multiple violations into a single claim. Under *J.T. Einoder* and *Perry*, that kind of change—altering the legal consequences of violations that had already given rise to accrued claims—is a substantive change that cannot be applied to those pre-amendment claims.

This change also affects behavior outside the courtroom—another hallmark of substantive law. As this Court recognized in the *Cothron* litigation, if later violations carry no legal consequences, "private entities would have 'little incentive to course correct and comply.'" 216 N.E.3d at 928 (quoting *Cothron v. White Castle Sys.*, 20 F.4th 1156, 1165 (7th Cir. 2021)). Pre-amendment BIPA's

per-scan liability structure created a continuing incentive not to violate the statute again. By eliminating liability for repeated violations, Amended BIPA removes that incentive and alters the rights and obligations of private entities and individuals in the real world. That, again, is the domain of substantive law.

Because Amended BIPA eliminates accrued causes of action, removes liability for repeated violations, and reshapes incentives governing real-world conduct, it is a substantive amendment. Under Illinois law, such amendments operate prospectively only.

### 3. Amended BIPA Is Not a Remedial Change Because It Alters When a Cause of Action Arises and Eliminates Accrued Claims

Defendants argue that Amended BIPA is merely remedial because the underlying statutory duties remain unchanged. *See, e.g.,* UP Brf. at 16-17. That framing misstates Illinois law. The procedural–substantive distinction does not turn on whether a statute leaves the underlying right intact; it turns on whether the amendment changes what conduct gives rise to a cause of action and what legal consequences attach to that conduct. Amendments that alter those elements are substantive, regardless of how they might be described in terms of "enforcement."

Illinois law makes this distinction explicit. *Perry* explains that substantive law "creates, defines, and regulates the rights, duties, and powers of the parties," and determines "when a cause of action for damages or other relief has arisen." 106 N.E. 3d at 1033-1034 (citations omitted). When an amendment alters the circumstances under which a cause of action arises, it alters substantive law.

*Atkins* reinforces the point, holding that "[s]ubstantive law . . . establishes the rights whose invasion may be redressed through a particular procedure," and cautioning that the fact an amendment has procedural consequences "does not make the amendment procedural." 838 N.E.2d at 947-948 (citations omitted).

The Illinois Supreme Court's decision in *J.T. Einoder* confirms that the availability of liability—that is, whether certain conduct gives rise to an enforceable cause of action—is a substantive matter, not a procedural one. There, the Court held that an amendment was substantive because it "creates an entirely new type of liability . . . which was not available under the prior statute," and would "impose a new liability on defendants' past conduct" if applied retroactively. 28 N.E.3d at 766-767. Whether an amendment adds new liability or eliminates existing liability, the effect is the same: it alters the legal consequences of past conduct and therefore is substantive.

Amended BIPA effects exactly that kind of change. Before the amendment, each nonconsensual scan or transmission "accrue[d]" as "a separate claim." *Cothron*, 216 N.E.3d at 920, 929. Those claims existed the moment each violation occurred. The amendment collapses all repeated violations into a single claim, extinguishing the accrued causes of action that previously arose for every additional unlawful scan or transmission after the first. That is not a change in remedy. The statutory damages provision remains untouched. Nor is it a change in procedure. The steps for litigating a claim are the same. What has changed is whether a cause of action arises at all for violations that indisputably gave rise to accrued claims under pre-amendment BIPA.

Illinois law prohibits both retroactive expansion of liability and retroactive elimination of accrued liability unless the legislature expressly says otherwise. Section 4 protects "rights accrued" from later legislative alteration, and courts apply that protection equally whether the change increases or extinguishes liability for past conduct. Illinois courts have long treated amendments as substantive when they alter the existence, accrual, or scope of a cause of action. *People v. Glisson* explains that Section 4 draws a bright line: changes affecting "rights accrued" or the legal status of past conduct are substantive, while only changes to "the proceedings thereafter" qualify as procedural. 782 N.E.2d. 251, 256 (Ill. 2002). *J.T. Einoder* likewise held that an amendment is substantive when it "changes the type of liability" or the "scope of liability" attaching to past acts. 28 N.E.3d at 765-767. And *Thomas v. Guardsmark, LLC* confirms that under Illinois law, retroactivity turns on this same distinction—substantive changes cannot reach prior conduct because Section 4 itself bars it. 487 F.3d 531, 537-538 (7th Cir. 2007). Taken together, these decisions establish the governing principle: an amendment that alters whether, when, or how a claim arises is a substantive change under Illinois law.

Defendants' reliance on *Pogorzelska* v. *VanderCook College of Music*, No. 19CV5683, 2024 U.S. Dist. LEXIS 66011 (N.D. Ill. Apr. 11, 2024) is misplaced. That case involved whether a plaintiff could amend her complaint to add a claim under the Illinois Civil Rights Remedies Restoration Act—an amendment that "merely expands available remedies" for an already-accrued federal claim and "does not affect the accrual of a claim" or the scope of liability. 2024 U.S. Dist.

LEXIS 66011, at *6. The court concluded the Act was procedural because it "relate[d] only to remedies," *id.* at *6–7, and left the underlying cause of action untouched. Amended BIPA does the opposite. It does not adjust remedies after liability attaches; it eliminates the existence of multiple accrued claims and alters what constitutes a violation under Illinois law. *Pogorzelska* has no application where the amendment changes the accrual, existence, and enforceability of the claim itself.

*Dardeen v. Heartland Manor, Inc.*, 710 N.E.2d 827 (Ill. 1999), likewise provides no support for retroactivity. It pre-dates recent Illinois Supreme Court cases that have moved away from the "vested rights" approach. There, the court held that repeal of treble-damages availability under the Nursing Home Care Act affected "solely a remedy and [did] not affect a vested right," because a plaintiff has "'no vested right . . . to exemplary, punitive, vindictive or aggravated damages.'" 710 N.E.2d at 832 (quoting *Smith v. Hill*, 147 N.E.2d 321 (1958)). The amendment "alter[ed] neither the substance nor the elements of a violation," and the underlying right of action remained fully intact. *Id.* Amended BIPA is fundamentally different: it redefines what constitutes a violation, eliminates accrued statutory claims recognized in *Cothron*, and withdraws the underlying right of action for conduct that previously created liability. Eliminating accrued causes of action is a substantive change, not a remedial one. Unlike *Dardeen*, which addressed only the measure of recovery after liability was established, Amended BIPA alters the existence and enforceability of the right itself—placing it squarely within Section 4's prohibition on retroactive operation.

Eliminating accrued causes of action is a quintessential substantive change under Illinois law. It alters the scope of liability, redefines the legal consequences of conduct that has already occurred, and removes rights that existed at the time of the violation. Defendants' attempt to recast this as "remedial" misapprehends the governing framework. Under controlling Illinois Supreme Court precedent, Amended BIPA's elimination of accrued claims is a substantive amendment that cannot apply to those pre-amendment violations.

> **4.    Amended BIPA Alters Substantive Rights Because It Changes the Real-World Legal Consequences of Repeated Violations**

Illinois treats amendments as substantive not only when they affect the existence or scope of accrued claims, but also when they alter the real-world rights, duties, or incentives of regulated parties outside the courtroom. That principle is central here. Before the amendment, BIPA imposed distinct legal consequences for each nonconsensual scan or transmission. Those consequences were part of the statute's substantive design: every new violation triggered a new claim, a new potential statutory-damages award, and a renewed incentive to comply. As the Illinois Supreme Court—and this Court—recognized, the per-scan structure ensured that private entities had an ongoing reason to "course correct and comply." *Cothron*, 216 N.E.3d at 929 (quoting *Cothron*, 20 F.4th at 1165).

Amended BIPA changes those real-world legal consequences. By collapsing repeated violations into a single violation and claim, the amendment eliminates the escalating consequences that previously attached to each additional

unlawful scan or transmission. That change reduces the duties of biometric data collectors by eliminating the legal exposure arising for additional violations. It also diminishes the substantive rights of individuals whose biometrics are collected or disseminated without consent, because subsequent violations no longer give rise to independent causes of action. Those changes do not concern courtroom procedure. They concern the substance of what conduct gives rise to a claim, how many claims arise, and what legal incentives govern the conduct of regulated parties.

Illinois law recognizes such changes as substantive. Substantive law defines the rights, duties, and powers of the parties, and determines when a cause of action arises. *Perry*, 106 N.E.3d at 1033-1034 (citations omitted). Amended BIPA alters both. It redefines the duties of private entities by altering the consequences of noncompliance in the real world, and it prevents causes of action from arising for violations that previously gave rise to accrued claims. Under Illinois law, changes of that nature—changes that reshape rights and obligations attached to underlying conduct—are substantive amendments.

Defendants' remedial framing cannot account for these real-world changes. The amendment does not simply regulate how claims are presented in court; it rewrites the consequences of the underlying conduct and removes claims that accrued the moment each violation occurred. As *J.T. Einoder* makes clear, altering the legal consequences of past conduct, whether by imposing liability or eliminating it, is a substantive change. 28 N.E.3d at 766-767. Because Amended BIPA changes the substantive rights and obligations of the parties, and

eliminates accrued claims for pre-amendment violations, it operates only prospectively under Illinois law.

## II. AMENDED BIPA IS NOT A CLARIFICATION BECAUSE IT CHANGES THE ACCRUAL OF CLAIMS ESTABLISHED IN *COTHRON*

Defendants contend that Amended BIPA merely "clarifies" what BIPA always meant. Under Illinois law, that argument cannot stand. As the Illinois Supreme Court explained in *K. Miller Constr. Co. v. McGinnis*, an amendment is presumed to change the law, but "the presumption is not controlling and may be overcome by other considerations." 938 N.E.2d 471, 481 (Ill. 2010). Those considerations include whether the legislature (1) "declared" the amendment was intended to clarify existing law, (2) enacted the amendment in the face of "a conflict or ambiguity" in the prior statute, and (3) adopted an amendment that is "consistent with a reasonable interpretation of the prior enactment and its legislative history." *Id.* (citing *Middleton v. City of Chicago*, 578 F.3d 655, 663–64 (7th Cir. 2009)).

Amended BIPA does not satisfy any of these criteria. Before the amendment, the Illinois Supreme Court held in *Cothron* that "a claim accrues under [pre-amendment BIPA] with every scan or transmission" and that each instance is "a separate claim." 216 N.E.3d at 920, 929. The amendment replaces this per-scan accrual rule with a one-claim rule for repeated scans using the same method of collection. That is a change in the number of claims that arise, the point at which they arise, and the legal consequences that attach to repeated violations. Under *McGinnis* and *Middleton*, an amendment that contradicts or replaces a settled judicial construction is not a clarification, because it does not

"interpret the original act"—it changes it. *McGinnis*, 938 N.E.2d at 482.

Because Amended BIPA changes the accrual rule established by *Cothron*, it cannot be treated as a clarification of what the statute always meant. The remaining *McGinnis* factors confirm that conclusion.

### A.     The Legislature Did Not Declare That It Was Clarifying BIPA

The first *McGinnis* factor looks to whether "the enacting body declared that it was clarifying a prior enactment." 938 N.E.2d at 482. Nothing in Amended BIPA contains any such declaration. The statute does not say it is a "clarification," does not state that it "interprets" prior law, and does not purport to set out BIPA's original meaning. Under *McGinnis*, the absence of such a declaration weighs against treating a statutory change as a clarification. *Id.* ("the presumption of an intention to change the law is rebutted" only when other factors indicate a clarifying intent).

The legislative record confirms the point. No sponsor stated that the amendment was merely a clarification of existing law. They did not claim the per-scan accrual rule was a misunderstanding or that the legislature's intention in 2008 had been otherwise. To the contrary, sponsors repeatedly described the amendment as changing the accrual and liability rules. Senator Cunningham stated, "Senate Bill 2979 amends the Biometric Privacy Act, otherwise known as BIPA, and it does so by *changing the way liability accrues* when violations of the Act occur." JSA 37. Senator Cunningham further explained that "[u]nder the current interpretation of the law, liability accrues on a per occurrence basis . . . because of [the Supreme Court's] strict interpretation of the law *as written.*" *Id.*

(emphasis added). He confirmed that the "Senate Bill would *change* that. Instead, liability will accrue on a per person basis." *Id.* (emphasis added). House bill sponsor Representative Williams confirmed that the Bill "chang[es] the assessment of damages from a per violation, per occurrence to one person, one violation." JSA 3-4. That is the language of a policy change, not a backward-looking clarification.

Even more telling, sponsors emphasized that the amendment does not apply to pending or past cases. *See supra*, pp. 20-21. A legislature adopting a true clarification would expect the clarification to apply to pending cases because the legislature is declaring that the statute always had that meaning. Here, the sponsors' insistence on prospective-only application underscores that they understood the amendment changes the statute rather than restates prior meaning.

Defendants' reliance on isolated phrases from the debates—such as references to "scope" or "assessing damages"—cannot overcome the lack of any statement declaring clarifying intent. Under *McGinnis*, this factor weighs squarely against treating the amendment as a clarification.

### B.     Pre-Amended BIPA Was Not Ambiguous, as *Cothron* Held

The second factor identified in *McGinnis* asks whether "a conflict or ambiguity existed prior to the amendment." 938 N.E.2d at 482. Amended BIPA fails this factor as a matter of well-settled law. The Illinois Supreme Court has already held that pre-amendment BIPA was not ambiguous, including how claims accrue thereunder.

In *Cothron*, the court did not suggest any ambiguity in the pre-amendment text; to the contrary, it rejected the argument that the statute's plain meaning should be narrowed based on policy concerns or perceived burdens on defendants. 216 N.E.3d at 925-927. The court interpreted BIPA's text as written. *Id.* at 923, 924, and 928 (holding that where statutory language is "clear and unambiguous," courts "must apply the statute without resort to further aids of statutory construction," and explaining that BIPA's "statutory language clearly supports plaintiff's position" and that policy consequences "cannot override the statute's plain language").

Defendants point to the *Cothron* court's observation that the legislature could "make clear its intent regarding the assessment of damages" to argue that *Cothron* recognized ambiguity. *Id.* at 929. But that misreads the decision. The Court did not identify any ambiguity in the statute's meaning. Rather, the court acknowledged that some parties viewed the consequences of the statute as undesirable and stated that legislative change—not judicial revision—would be required to alter them. Nothing in *Cothron* suggests that the accrual rule was unclear or subject to multiple reasonable interpretations. It was not.

Under *McGinnis*, a clarifying amendment may exist only when the prior statute was genuinely ambiguous. 938 N.E.2d at 482. Because the Illinois Supreme Court has already determined that pre-amendment BIPA and its accrual of claims was clear and unambiguous, this factor weighs decisively against Defendants' clarification theory.

### C. The Amendment Is Not Consistent With Any Reasonable Interpretation of Pre-Amendment BIPA or Its Legislative History

The third *McGinnis* factor asks whether the amendment is "consistent with a reasonable interpretation of the prior enactment and its legislative history." 938 N.E.2d at 482 (citing *Middleton*, 578 F.3d at 663–64). Amended BIPA fails this factor for the same reason it fails the others: it is not consistent with any reasonable reading of the statute as it existed before the amendment, nor with the Illinois Supreme Court's authoritative construction of that statute.

### 1. Amended BIPA Contradicts the Judicial Construction in *Cothron*

Before the amendment, the Illinois Supreme Court held that "a claim accrues under [pre-amendment BIPA] with every scan or transmission" and that each instance is "a separate claim." *Cothron*, 216 N.E.3d at 920, 929. That was not dicta or speculation; it was the central holding of the case.

An amendment that contradicts an authoritative judicial construction is the paradigm case of an amendment that *changes* the law. A statute cannot simultaneously mean "every scan or transmission is a separate claim" (*Cothron*), and "repeated scans using the same method give rise to only one claim" (Amended BIPA).

Because the amendment adopts a rule that is incompatible with the prior judicial interpretation, it cannot be a clarification. *McGinnis* recognizes this point when it explains that the presumption of change is overcome only if the amendment reflects "an intention only to interpret the original act." 938 N.E.2d

at 482. An amendment that reverses a judicial construction cannot be described as "interpreting" the original.

### 2. The Legislative History Confirms that the Amendment Was a Change, Not a Clarification

The legislative history also defeats Defendants' position under this factor. Legislators repeatedly described the amendment as adopting a new accrual rule in response to *Cothron*. *See supra*, p. 20-21. They explained why they preferred a new rule and why they believed a "one person, one claim" structure was sound as a matter of policy. *See supra*, pp. 35-36. And they stated that the amendment does not apply to pending or past cases, which is inconsistent with a belief that the statute always meant what the amendment now provides. *See supra*, pp. 20-21. Under *McGinnis*, clarification requires consistency with the prior statute's meaning and legislative history. 938 N.E.2 at 482. Here, the amendment cannot be squared with either.

Because Amended BIPA is inconsistent with the prior statute, the prior judicial construction, and the prior legislative history, it fails the third *McGinnis* factor as a matter of law.

### D. Because All Three *McGinnis* Factors Fail, Amended BIPA Is Not a Clarification

Under *McGinnis*, an amendment is a clarification only when the legislature indicates that it is interpreting the original statute, when the prior statute was genuinely ambiguous, and when the amendment is consistent with a reasonable reading of the original text and its legislative history. 938 N.E.2d at 482. None of those conditions is present here. The legislature did not declare that it was

clarifying BIPA. There was no ambiguity in the prior statute; the Illinois Supreme Court held that the per-scan accrual rule was clear. And the amendment is not consistent with any reasonable interpretation of the original statute or with the judicial construction in *Cothron*—it contradicts both.

Those conclusions are decisive. A statutory amendment that rejects a judicial construction, eliminates accrued causes of action, and adopts a new rule governing when claims arise is a change in the law, not a clarification of what the law always meant. The *McGinnis* presumption of change is not rebutted here. It is confirmed.

## III.  EVERY COURT TO CONSIDER THE QUESTION HAS CORRECTLY HELD THAT AMENDED BIPA DOES NOT APPLY RETROACTIVELY

Since the amendment was enacted, every court to consider the issue has held that Amended BIPA does not apply retroactively to conduct predating its effective date. The uniformity of these decisions reinforces what the statutory text, legislative history, and Illinois retroactivity doctrine already compel: the amendment is prospective only.

Courts across Illinois and the federal district courts have recognized that the amendment substantively changed the law by replacing the per-scan accrual rule with a one-claim-per-person rule. Those courts have therefore applied the amendment only to conduct occurring on or after its effective date. They have uniformly rejected defendants' arguments—identical to the Defendants' here— that the amendment was a mere clarification or that it should apply to pre-amendment violations.

Federal district courts and Illinois circuit courts evaluating retroactivity in parallel cases have repeatedly emphasized the same core points:

(1) pre-amendment BIPA imposed liability for each nonconsensual scan or transmission;

(2) Amended BIPA changes that rule by collapsing multiple violations into a single claim;

(3) the amendment "does not apply to pending or past cases," as the legislative sponsors explained; and

(4) nothing in the amendment expresses retroactive intent.

(*See generally Schwartz*, 2024 U.S. Dist. LEXIS 213002; *Blocker v. Biomat USA, Inc.*, No. 24CV2676 2024 U.S. Dist. LEXIS 240565 (N.D. Ill. Dec. 6, 2024); *Giles*, 2025 U.S. Dist. LEXIS 12888; *Jones v. USP Chicago, Inc.*, No. 23CV16817, 2025 U.S. Dist. LEXIS 101937 (N.D. Ill. May 29, 2025); *Wallace v. Vee Pak, LLC*, No. 24L4560 2024 Ill. Cir. LEXIS 1719 (Cook Cty. Cir. Ct. Oct. 2024); *Rojo v. Homer Tree Care, Inc.*, No. 23L8588, 2024 Ill. Cir. LEXIS 1720 (Cook Cty. Cir. Ct. Oct. 2024); *Gagen v. Mandell Menkes, LLC*, slip op. at 3 (Cook Cty. Cir. Ct. Oct. 2024) (UP A29).

These courts have all applied the straightforward Illinois retroactivity framework and concluded that the amendment cannot operate on conduct occurring before its effective date. The only case to initially reach a contrary conclusion—the original *Gregg I* opinion—was vacated on reconsideration for "manifest error" in *Gregg II*. CT A2-A6.

Defendants cite no case reaching a different conclusion. Their briefs acknowledge that district courts have consistently rejected retroactivity arguments. And they offer no authority—state or federal—holding that Amended

BIPA applies to pre-amendment violations. Nor could they. Courts analyzing the statute after *Cothron* have uniformly treated the amendment as a substantive change that does not apply retroactively. That consensus reflects the same core reasoning explained above: the amendment eliminates accrued claims and alters the legal consequences of past violations, which is impermissible under Illinois law absent an express retroactivity directive.

The unanimity of judicial decisions is not a substitute for statutory analysis, but it confirms that Defendants' position is untenable. Courts applying Illinois law have repeatedly—and correctly—recognized that Amended BIPA substantively changes the accrual rule and cannot apply to pre-amendment conduct. This consensus reinforces the conclusion compelled by the statute's text, legislative history, and governing retroactivity doctrine: Amended BIPA applies only prospectively.

## IV. ILLINOIS SEPARATION-OF-POWERS PRINCIPLES INDEPENDENTLY FORBID RETROACTIVE LEGISLATIVE REVISION OF BIPA'S JUDICIALLY CONSTRUED MEANING

Defendants' position also collides with bedrock separation-of-powers limits under Article II, Section 1 of the Illinois Constitution. Having lost in *Cothron*, they now ask this Court to treat the General Assembly's 2024 amendment as if it could retroactively overrule the Illinois Supreme Court's construction of BIPA and extinguish accrued claims. But Illinois law is clear that once the Illinois Supreme Court has finally interpreted a statute, the legislature cannot retroactively change that construction by relabeling a substantive amendment as a "clarification."

Illinois courts have repeatedly held that the General Assembly may not retroactively revise a judicial construction by re-describing its intent after the fact. The principle is stated most directly in *Roth v. Yackley*, where the court explained:

> The General Assembly's subsequent declaration of prior intent cannot alter the clear import of the prior statutory language . . . [and] represents a legislative attempt to retroactively apply new statutory language and to thereby annul a prior decision of this court. This is an assumption by the General Assembly of the role of a court of last resort in contravention of the principle of separation of powers . . . . While the General Assembly has the power to draft legislation and to amend statutes prospectively if it believes that a judicial interpretation was at odds with its intent, it is the function of the judiciary to determine what the law is.

*Roth v. Yackley*, 396 N.E.2d 520, 522 (Ill. 1979) (citations omitted); *see also People v. Rink*, 455 N.E.2d 64, 68 (Ill. 1983) ("Of course, the legislature, after a final judicial interpretation of legislative intent, cannot effect a change in that construction by a later declaration of what it did intend[.]") (collecting cases); *Bates v. Bd. of Educ.*, 555 N.E.2d 1, 4 (Ill. 1990) (same).

The Illinois Supreme Court has applied the same rule in expressly constitutional terms. In *In re Marriage of Cohn*, the court held that "the legislature invaded the province of the judiciary by retroactively overruling a decision of a reviewing court. This constitutes a violation of article II, section 1, of the Illinois Constitution, which embodies the principle of separation of powers." 443 N.E.2d 541, 548 (Ill. 1982). Similarly, in *Illinois Bell Tel. Co. v. Fair Emp't Practices Comm'n*, the court rejected an attempt to treat a legislative declaration as controlling, holding that "a legislative body cannot retroactively effectuate a change in statutory language by issuing a declaration of prior

intent." 407 N.E.2d 539, 541 (Ill.1980) (citing *Roth*, 396 N.E.2d at 522). Together, these cases make clear that the legislature cannot use a purported "clarification" to retroactively displace a judicial construction because doing so violates Illinois's constitutional separation of powers.

That is precisely what Defendants ask this Court to permit here. *Cothron* held that "a claim accrues under [pre-amendment BIPA] with every scan or transmission of biometric identifiers or biometric information without prior informed consent" and that each such act is "a separate claim." 216 N.E.3d at 920, 929. The amendment adopts a different rule and, if applied retroactively, would "annul" the *Cothron* construction by extinguishing claims already accrued under that decision. Under established Illinois Supreme Court precedent, the legislature has no power to retroactively change BIPA's judicially construed meaning in that way.

Thus, even if statutory retroactivity principles left any uncertainty—and they do not—Illinois separation-of-powers doctrine independently bars treating Amended BIPA as a retroactive "clarification" of BIPA's accrual rule.

## V.  CONSTITUTIONAL AVOIDANCE BARS RETROACTIVE APPLICATION OF AMENDED BIPA

The canon of constitutional avoidance independently forecloses Defendants' retroactivity theory. Courts have a "duty to avoid interpretations that raise constitutional questions and cast doubt on validity." *Maddux v. Blagojevich*, 911 N.E.2d 979, 990 (Ill. 2009). Where that is true, courts must adopt an interpretation that avoids those constitutional issues.

Retroactive application of Amended BIPA would raise precisely the kind of

constitutional concerns that trigger the avoidance doctrine. Illinois due-process principles protect vested rights from legislative impairment. As the Illinois Supreme Court has held, "The legislature is without constitutional authority to enact a law that is truly retroactive, in that it impairs vested rights even if that is its expressed intention." *First of Am. Trust Co. v. Armstead*, 664 N.E.2d 36, 40 (Ill. 1996) (citing *City of Chi. v. Collin*, 134 N.E. 751, 753 (Ill. 1922)). Those vested rights are "interests that are protected from legislative interference by our due process clause." *Id.* at 39. Likewise, the court has long held that "it is not competent for the legislature to give such operation to an act where it will affect existing or vested rights." *City of Chi.*, 134 N.E. at 753. Even though "Illinois courts no longer utilize a vested rights analysis to determine temporal reach," the existence of a vested right "might still provide the basis for a state constitutional due-process challenge to a law." *Schwartz*, 2024 U.S. Dist. LEXIS 213002, at *9 and n.1.

Accrued BIPA claims fall squarely within those protected interests. Under *Cothron*, "the plain language of section 15(b) and 15(d) shows that a claim accrues under the Act with every scan or transmission" without informed consent. 216 N.E.3d at 929. BIPA then provides a "claim . . . for each violation." 740 ILCS 14/20. Thus, the rights at issue here came into existence at the moment each unlawful scan occurred, and Section 4 protects such accrued rights from retroactive extinguishment.

Retroactively applying the amendment would extinguish those accrued claims, directly impairing vested interests in violation of Illinois due process. The

existence of a vested claim is itself constitutionally protected. These constitutional concerns are not hypothetical. They follow directly from the Illinois Supreme Court's construction of pre-amendment BIPA in *Cothron*, which held that each unlawful scan creates an accrued statutory claim. Retroactively applying Amended BIPA to extinguish those claims would eliminate vested rights that existed at the time the violations occurred—precisely the constitutional harm *Armstead*, *Collin*, and *Schwartz* identify.

The avoidance canon therefore compels the same conclusion reached under Section 4, substantive-change doctrine, and separation-of-powers principles: Amended BIPA must operate prospectively only. Choosing any other interpretation would create the very constitutional problems Illinois law instructs courts to avoid.

## VI.    RETROACTIVITY IS A LEGAL QUESTION, NOT A POLICY DEBATE

The *amici*'s parade of horribles has no bearing on the only question before the Court: whether Amended BIPA applies retroactively. Retroactivity turns on statutory text, Section 4 of the Statute on Statutes, and settled constitutional principles—not policy preferences. The Illinois Supreme Court already acknowledged the potential for "significant damages awards" that BIPA's original text could produce. *Cothron*, 216 N.E. at 928. *Cothron* decided the statute's meaning. Once the Illinois Supreme Court has conclusively interpreted unambiguous statutory text, neither litigants nor the legislature may retroactively displace that meaning through post-hoc policy arguments. *See, e.g.*, *Rink*, 455 N.E. 2d at 68.

Equally important, Illinois law does not permit courts to weigh or rebalance policy considerations in deciding retroactivity. As explained above in Section I, Section 4 of the Statute on Statutes draws a bright line: substantive amendments—those that alter rights, liabilities, or the scope of statutory violations—apply prospectively unless the legislature unmistakably provides otherwise. The amendment here narrows what constitutes a "violation" and is thus substantive as a matter of law. Whether the *amici* believe those accrued claims expose businesses to "stratospheric" or "ruinous" damages is irrelevant. Courts "do not sit as a superlegislature" to revise statutes based on perceived policy shortcomings, nor can policy concerns revive a clarification theory that fails every doctrinal test. *Hayen v. County of Ogle*, 463 N.E. 2d 124, 127 (Ill. 1984) (quoting *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423, (1952)). Policy concerns do not supply retroactivity where Illinois law forbids it.

## VII. THE ILLINOIS SUPREME COURT WOULD RULE AGAINST RETROACTIVE APPLICATION OF AMENDED BIPA

When interpreting Illinois law, this Court's task is to predict how the Illinois Supreme Court would resolve the issue. *Comm. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 811 (7th Cir. 2018). Under that framework, the conclusion is straightforward: the Illinois Supreme Court would hold that Amended BIPA applies prospectively only. The answer follows directly from the court's own decisions and from the legislature's explicit statements.

The Illinois Supreme Court has repeatedly held that substantive amendments operate prospectively under Section 4 unless the legislature unmistakably provides otherwise. *J.T. Einoder*, 28 N.E.3d at 765. It has already

held that under pre-amendment BIPA "a claim accrues . . . with every scan or transmission" and that each instance is "a separate claim." *Cothron*, 216 N.E.3d at 920, 929. Retroactive application would extinguish those accrued claims and contradict the court's unambiguous construction—something Illinois law does not permit. *See Rink*, 455 N.E.2d at 68.

The legislature understood this. The House and Senate sponsors stated repeatedly that the amendment would not be retroactive, would not affect any pending or past cases, and did not include any retroactivity provision. *See supra*, pp. 20-21. Those statements align precisely with Section 4, with *Cothron*, and with the court's separation-of-powers jurisprudence. They leave no question about the temporal reach the legislature intended or about what Illinois law permits.

Nothing in *Cothron* suggests the Court would tolerate a retroactive override of its own definitive construction. To the contrary, it recognized that any adjustment "are best addressed by the legislature," which necessarily means prospectively. *See* 216 N.E.3d at 928-929.

Given its retroactivity precedents, its authoritative interpretation of BIPA, its separation-of-powers cases, and the sponsors' direct statements, the Illinois Supreme Court would hold that Amended BIPA applies only prospectively.

**CONCLUSION**

This Court should affirm the district court's conclusion that the amendment to BIPA does not apply retroactively.


Dated: November 19, 2025

Daniel A. Edelman
Dulijaza (Julie) Clark
Edelman, Combs, Latturner &
    Goodwin, LLC
20 South Clark Street
Suite 1800
Chicago, IL 60603
(312) 739-4200
dedelman@edcombs.com

*Counsel for Reginald Clay*

Respectfully submitted,

/s/  *Daniel R. Brown*

Daniel R. Brown
Paul J. Ripp
Williams Barber & Morel Ltd.
233 South Wacker Drive
Suite 6800
Chicago, IL 60606
(312) 443-3200
drb@williamsbarbermorel.com

*Counsel for Brandon Willis*


David M. Bizar
DJC Law, PLLC
1012 W Anderson Ln
Austin, Texas 78757
(512) 220-1800
dbizar@teamjustice.com

*Counsel for John Gregg*

**TYPE VOLUME CERTIFICATION**

1.      This brief complies with the type volume limitation of Fed.R.App.P. 32(a)(7)(B), as modified by Seventh Circuit Rule 32, in that it contains 12,276 words, according to the word counting feature of Microsoft Word, used to prepare it.

2.      This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(6), as modified by Seventh Circuit Rule 32(b), in that it was printed in Bookman Old Style 12 point type, a proportionally spaced typeface.

Dated: November 19, 2025

*/s/ Daniel R. Brown*
Daniel R. Brown

**CERTIFICATE OF SERVICE**

      Daniel R. Brown certifies that on November 19, 2025, this document was filed via ECF, causing a copy to be served on all counsel of record.

*/s/ Daniel R. Brown*
Daniel R. Brown

# JOINT SUPPLEMENTAL APPENDIX

## Pursuant to Circuit Rule 30(e)

# TABLE OF CONTENTS

## I.   Additional Material from N.D. Ill. District Court, Case No. 1:21-cv-01716:

| Page | Docket No. | Description |
|------|-----------|-------------|
| ** | 192 | Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts and Plaintiff's Local Rule 56.1 Statement of Additional Material Facts in Support of Cross-Motion for Partial Summary Judgment |
| JSA1 | 192-1 | Exhibit 1: 103rd Illinois General Assembly, House Proceedings, May 16, 2024, pp. 1, 44–53 |
| ** | 206 | Plaintiff's Reply in Support of Cross-Motion for Partial Summary Judgment Regarding the Temporal Reach of Amended BIPA |
| JSA13 | 206-1 | Exhibit D: Audio Transcription of 103rd Illinois General Assembly, Senate Proceedings, April 11, 2024 |

## II.   Material Presented for Judicial Notice:

| Page | Docket No. | Description |
|------|-----------|-------------|
| JSA36 | ** | 103rd Illinois General Assembly, Senate Proceedings, April 11, 2024, pp. 1, 57–66 |

# EXHIBIT 1

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                                    5/16/2024

Speaker Evans:  "The House shall be in order. Members should be in
        their chairs. We shall be led in prayer today by Minister
        Justin Odom. Minister Odom is with Mount Vernon Church of
        Christ in Mount Vernon, Illinois. Minister Odom is the guest
        of Representative Severin."

Minster Odom:  "Let's pray. Gracious and heavenly Father, as we
        gather in this esteemed Assembly of our State
        Representatives, I humbly come before you, recognizing your
        sovereignty over all affairs. I acknowledge that it is your
        wisdom that guides us and your grace that sustains us.
        Heavenly Father, grant this Assembly wisdom to govern justly
        and with integrity. Help this Body to set aside their agendas
        and partisan interests, seeking instead the common good and
        welfare of all our citizens. May your principles of justice,
        compassion, and righteousness be the foundation of their
        deliberations and decisions. Father, I pray for our leaders,
        both elected and appointed, that they may be filled with
        wisdom, discernment, and humility as they carry out their
        duties. Grant them clarity of mind, courage of conviction,
        and a heart of compassion for those that they serve. Bless,
        O Lord, the people of our state, from the youngest to the
        oldest, from the… every background and walk of life. I pray
        that you will be with us and you will unite us in our diversity
        through you and your word. Father, I commit this Assembly's
        deliberations and decision into your hands, trusting in your
        providence and seeking your will in all things. May their
        words and their actions bring glory and honor to your holy
        name. All these things I ask in Jesus' name. Amen."

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                                    5/16/2024


Speaker Evans:  "Seeing no further discussion, the question is, 'Shall Senate Bill 2976 pass?' All those in favor vote 'aye'; all opposed vote 'nay'. The voting is open. Have all voted who wish? Have all voted who wish? Have all voted who wish? Mr. Clerk, please take the record. On this question, there are 83 voting 'yes', 29 voting 'no', and 0 voting 'present'. And this Bill, having received the Constitutional Majority, is hereby declared passed. Continuing down page 6 of the Calendar of Senate Bill-Third Reading, we have Senate Bill 2979, Representative Ann Williams. Mr. Clerk, read the Bill."

Clerk Bolin:  "Senate Bill 2979, a Bill for an Act concerning civil law. Third Reading of this Senate Bill."

Speaker Evans:  "Representative Williams."

Williams, A.:  "Thank you, Mr. Speaker. In 2008, the Illinois General Assembly passed the Biometric Information Protection Act. That law simply required notice and consent before any entity collected your personal biometric information, such as a facial scan, fingerprint, et cetera. The courts have since considered this law in various contexts. And a recent case, White Castle… *Cothron v. White Castle*, provided that, while the court believed the policy-based concerns could involve potential excessive damage awards, they felt that was best addressed by the Legislature, so they invited us to weigh in about damages. This Bill is simply a response to the court's invitation to address liability, clarify the intent that we have regarding damages for each violation. This Bill does that by providing for easier compliance, allowing for electronic signatures for consent, as well as changing the assessment of damages from a per violation, per occurrence to

JSA 3

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                          5/16/2024

one person, one violation. So, this Bill addresses a liability issue, as outlined in White Castle, provides some relief to small businesses in terms of ease of compliance, while still maintaining what we all believe is an important privacy right to protect. And that is the right for our very unique biometric information not to be collected without notice and consent. We recognize there is significant interest in this issue, so I'm happy to answer any questions."

Speaker Evans: "Is there any discussion? Representative Keicher is recognized."

Keicher: "Thank you, Mr. Speaker. Will the Sponsor yield?"

Speaker Evans: "She indicated she will."

Keicher: "Excellent. Thank you, Representative, for bringing this as is. I think there's been a little bit of a discussion on somewhat… what I would term deficiencies in what's presented here from what industries have asked us. And I think the examples that they put out there are examples based on lawsuits that have been filed and potential verdicts that are out there. So, with that in mind, I'd like to ask, I… I don't see that this has any retroactivity involved in the language. Could you help me walk through why that is not in here?"

Williams, A.: "Well, let me just mention one thing to you. So, many of us heard a sky-is-falling scenario with regard to the White Castle case, where the damages, we were told, could reach up to $17 billion. Just a side note. Within the past couple weeks, that case was settled for 9 million, with an M, dollars. So, while the courts could have assessed damages to the max, certainly they're courts of equity, and they've not

JSA 4

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                                    5/16/2024

chosen to do that. White Castle is an example of damages being reined in, I think, partially by the existence of this Bill."

Keicher:  "Okay. And so, to clarify, there is no retroactivity? That… that is something that you're deeming inappropriate at this time?"

Williams, A.:  "We are not including a retroactivity provision. However, I think we'll be working on some legislative intent that may be helpful in… in terms of that issue."

Keicher:  "Okay. I also understand that there's been a little bit of a… a cropping up, if you will, of suits against data centers regarding our… our BIPA legislation. Are you familiar with that going on? And… and the allegation under our BIPA statute is that since they're warehousing the data, that they are culpable under the BIPA statute. Do you have any opinion or… or commentary on that as it relates to your piece of legislation?"

Williams, A.:  "Again, this is a narrowly-tailored piece of legislation designed to address the issue in *Cothron v. White Castle*. And that's what we've done here, is really to scale back the damages, again, to per person versus per violation. So, we have not weighed in on some of those broader issues on this… in this case."

Keicher:  "Okay. And… and so, is there a methodology now in place with this piece of legislation that would enable or help, say, a business that used a thumbprint time clock for their employees to time in and time out of their workplace?

Williams, A.:  "I'm sorry, could you repeat the question?"

Keicher:  "Yeah. So, one of the most common…"

Williams, A.:  "I'm having trouble hearing."

JSA 5

```
                    STATE OF ILLINOIS
                  103rd GENERAL ASSEMBLY
                 HOUSE OF REPRESENTATIVES
                   TRANSCRIPTION DEBATE
```

106th Legislative Day                              5/16/2024


Keicher:   "…yeah, one of the most common suits, as I understand
           it, that's filed under the BIPA statute has been an employer
           who unknowingly used a thumbprint time clock, where they would
           have their employees thumb in and thumb out each and every
           day. And that's one of the things that led to the White Castle
           potential verdict. So, what would be the protocol in place so
           that an employer could use a thumb print clock and not be in
           violation of BIPA once this legislation is in place?"

Williams, A.:  "That is unchanged. It's very, very simple. It is
           notice and consent they are… biometric information is being
           collected. And I will note, while that issue comes up quite
           a bit in the workplace setting, this is also about your face
           being scanned when you go to a place of business, to a place
           of worship, to really anywhere in your community. And that's
           something that, in Illinois, we are protected from. Many
           states, your biometric information, your very unique
           information is collected without your knowledge. Here, we
           have the foresight to protect that information. And so, we're
           just limiting the damages to make them a little a more
           reasonable, consistent with the request made by the court in
           Cochran… Cothron."

Keicher:   "Sticking with the consent issue, what would be the… the
           accepted methodology in consent and… and any methodology to
           retract consent?"

Williams, A.:   "The… the Bill doesn't go into a lot of great
           detail, but I will note that we provided for electronic
           signatures to make that compliance even easier than it is
           now. As you know, when you start at any place of employment,
           there are numerous documents you have to sign, information to
```

JSA 6

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                                    5/16/2024

     review. And this could easily be simply part of that process, and always has been."

Keicher: "And so… so, it… you… we could have electronic signature authorizing collection of the biometric information and it would be acceptable and it would not be in violation of the BIPA statute if this legislation passes?"

Williams, A.: "Yeah. We defined electronic signature as meaning an electric sound, symbol, or a process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record. Electronic signature, pretty clear that is there."

Keicher: "Could signature or acceptance be a condition of employment?"

Williams, A.: "I don't believe that we weigh in on that here in BIPA."

Keicher: "Okay."

Williams, A.: "Or we don't change anything in the current law."

Keicher: "And is there any methodology for withdrawing consent?"

Williams, A.: "I think that's probably up to the company. I don't think that's addressed within the four corners of the BIPA statute, as far as I'm aware."

Keicher: "Okay. And the… the other piece that I wanted to bring up was the facial recognition. I understand there is a significant safety issue that's presented by many of the trucking firms that transit the State of Illinois because they use facial recognition technology in the truck cab to make a determination of whether a truck driver is getting drowsy, falling asleep, or… or paying attention to the road in front of them. What would be the situation that trucking

JSA 7

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                          5/16/2024

companies would find themselves in after this piece of
legislation passes?"

Williams, A.:  "Again, it limits the damages to per person versus
per occurrence, if that company somehow wasn't aware of the
law that's been in effect since 2008 and was somehow unable
to obtain consent. Again, these are not complicated
requirements here. Just notice and consent."

Keicher:  "You know, and… and I guess that's of the problem that
I'm worried about, is I'm worried about a trucking firm, say,
out of Nebraska that's taking a load out to New Jersey,
transits I-80 across the State of Illinois, and they've got
constant monitoring on the driver. They would be in… still in
violation of the BIPA statute?"

Williams, A.:  "Well, I think that depends on… that's more of a
jurisdictional or venue question for the courts and goes
beyond the scope of this legislation today."

Keicher:  "Thank you for bringing what's here, Representative. I
think it's a good start. I appreciate it. I hope that we can
do it… a little bit more work on this in future and we can
address the data center gap that's sitting out there that's
currently preventing data centers from proceeding to a
construction status. Thank you."

Williams, A.:  "Thank you."

Speaker Evans:  "Representative Didech is recognized."

Didech:  "Will the Sponsor yield?"

Speaker Evans:  "Indicated she will."

Didech:  "I… I have just a few questions for legislation intent.
Representative, in the *Cothron v. White Castle* decision, the
Illinois Supreme Court invited the General Assembly to make

JSA 8

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                                    5/16/2024

clear our intent regarding the assessment of damages under
the Biometric Information Privacy Act. Does this Amendment to
the Act clarify our intention that the availability of
discretionary liquidated damages serves to deter future
violations without destroying a defendant's business?"

Williams, A.: "Yes."

Didech: "And does this Amendment to the Act suggest any
legislative intent to authorize a damages award that would
result in the financial destruction of a business?"

Williams, A.: "No."

Didech: "Does this Amendment to the Act apply retroactively to
cases already decided or to pending cases?"

Williams, A.: "No, but a court or reviewing court could take
judicial notice of our Amendment to the Act in determining an
initial award or in reducing an award."

Didech: "Thank you for answering these questions. I urge an 'aye'
vote."

Speaker Evans: "Any additional discussion? Representative Ugaste
is recognized."

Ugaste: "Thank you, Mr. Speaker. To the Bill. Representative and
I had conversations during committee and… and Representative
Keicher had some detailed questions. So, I'm not going to go
back over that. I just wanted to state that while I appreciate
what is being done here as far as a partial fix to help in
the situation, I, unfortunately, don't believe I can support
because, while you… we might not get everything we want out
of something, sometimes some partial fixes just don't go quite
far enough. And, unfortunately, as Representative Keicher was
pointing out, there's still much work that needs to be done

JSA 9

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                                    5/16/2024

to make this so that we can even say, okay, this a good
compromise on behalf of business. I am hoping that going
forward consideration can… can still be given to other items
which protect our biometric information. I want that
protected as much as anyone here in the chamber. I don't want
anyone taking my biometric data and sharing it with anyone,
neglecting proper care for it, or doing anything of that
nature. But I also don't believe a company should be penalized
when no actual harm's been done, they've taken steps to remedy
things, and we're just allowing a suit because of maybe a
simple mistake or, better yet, they can't even comply with
our law, such as in the data center case. Which, if they're
storing someone's information, that someone who is sending
their information to a cloud from a business and didn't get
the proper consent, well, the data center certainly can't get
consent 'cause they don't even know that it's there. So, I
would really like to see more work done on this. For those
who don't know, we are losing out on data centers because of
this. We had a number of data centers that were scheduled to
come in that were put on hold because of this. We have about
12 suits now in State of Illinois suing data centers, and
it's something we need to address so that we don't inhibit
growth in an industry in which Illinois and Chicago had become
a leader not only nationally, but in the world. And we are
quickly declining in our status in that field, and a fix to
this would go a long way to help it. So, while I appreciate
the Sponsor's work in getting this Bill through and the help
it's going to provide, I just think we need to keep talking
and go a step further in order to make certain that businesses

STATE OF ILLINOIS
103rd GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

106th Legislative Day                                    5/16/2024

do what they're supposed to and protect the data they're
collecting but, at the same time, aren't punished
unnecessarily. And that if we're going to apply a penalty to
something, we make certain it… it's something, such as a data
center, can even comply with if we're requesting it of… of
them. Thank you."

Speaker Evans:  "Representative Rashid is recognized."

Rashid:  "Thank you, Mr. Speaker. To the Bill. I want to thank
Representative Williams and Senator Cunningham for their
tireless work on this legislation. This Bill keeps the
critical privacy protections that are at the core of the
Biometric Information Privacy Act, protecting people from
social media companies' data harvesting of personal
information like facial scans. But it adds much needed clarity
that helps small businesses operate in a more predictable
regulatory environment. I know that many small business
owners will be relieved to see this measure passed. I strongly
urge an 'aye' vote."

Speaker Evans:  "Representative Williams to close."

Williams, A.:  "Thank… thank you, Mr. Speaker. I appreciate all
the conversations, both on the floor and prior to bringing it
to the floor. Again, this is a really straightforward
requirement in BIPA for a very significant and valuable
privacy right. This Bill addresses the invitation by the court
to address damages, and that's exactly what we're doing here.
Appreciate an 'aye' vote."

Speaker Evans:  "Seeing no discussion, the question, 'Shall Senate
Bill 2979 pass?' All those in favor vote 'aye'; all those
opposed vote 'nay'. The voting is open. Have all voted who

JSA 11

```
                    STATE OF ILLINOIS
                 103rd GENERAL ASSEMBLY
                HOUSE OF REPRESENTATIVES
                  TRANSCRIPTION DEBATE
```

106th Legislative Day                           5/16/2024

wish? Have all voted who wish? Have all voted who wish? Mr.
Clerk, please take the record. On this question, there are 81
voting 'yes', 30 voting 'no', 0 voting 'present'. And this
Bill, having received the Constitutional Majority, is hereby
declared passed. Representative Ford, for what reason do you
seek recognition?"

Ford:  "Mr. Speaker and Members of the House, I rise for a point
of personal privilege."

Speaker Evans:  "Please speak your point."

Ford:  "Mr. Speaker and Members of the House, please join me in
welcoming my friend Fred Crespo on his birthday. I remember
when he came, he had black hair, and now he's got gray hair.
Happy birthday, Fred."

Speaker Evans:  "Continuing on page 6 of the Calendar of Senate
Bills-Third Reading, we have Senate Bill 2980, Representative
Ness. Mr. Clerk, read the Bill."

Clerk Bolin:  "Senate Bill 2980, a Bill for an Act concerning
regulation. Third Reading of this Senate Bill."

Speaker Evans:  "Representative Ness."

Ness:  "Thank you, Mr. Speaker. Senate Bill 2980 amends the Child
Care Act by eliminating the public notification of… of
facilities that… licensed by DCFS when it allows them range
and flexibility to make changes to… to be able to take in
children as needed. And this was an initiative of DCFS. There
are no proponents, and I request an 'aye' vote."

Speaker Evans:  "Any discussion? Representative Windhorst is
recognized."

Windhorst:  "Thank you, Mr. Speaker. Will the Sponsor yield?"

Speaker Evans:  "Indicates she will."

# EXHIBIT D

# Audio Transcript

Case Number: N/A
Date: April 11, 2024

In the matter of:

# Senate Debate

# AUDIO TRANSCRIPTION

**ORIGINAL**

Reported by:

Katherine Lenti
CSR No. 084.004958



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

1

2

3                  AUDIO TRANSCRIPTION

4                         of

5                    SENATE DEBATE

6

7

8

9                    Audio Labeled:

10        04-11-2024- Senate SB2979 3rd Reading.mp3

11

12

13

14

15

16

17

18

19

20

21

22

23 Transcribed By:

24 Katherine Lenti

25 CSR 084.004958

1              (Beginning of recording.)

2         PRESIDENT HARMON:  We're going to turn the page.

3    We're going to go up to the top of the page.  Senator

4    Cunningham on Senate Bill 2979.

5         Mr. Secretary, please read the bill.

6         Senator Cunningham seeks leave of the body to

7    return Senate Bill 2979 to the order of second reading.

8    Leave is granted.  Are there any floor amendments

9    approved for consideration?

10        Our mistake.  Third reading.

11        Mr. Secretary, please read the bill.

12        SECRETARY:  Senate Bill 2979, an act concerning

13   civil law.  Third reading of the bill.

14        PRESIDENT HARMON:  Senator Cunningham, on your

15   bill.

16        SENATOR CUNNINGHAM:  Thank you, Mr. President.

17        Senate Bill 2979 amends the Biometric

18   Information Privacy Act, otherwise known as BIPA, and it

19   does so by changing the way liability accrues when

20   violations of the Act occur.

21        Under current interpretation of the law,

22   liability accrues on a per occurrence basis or sometimes

23   that's referred to as a per swipe basis, particularly in

24   the context of fingerprints.

25        Senate Bill 2979 would change that.  Instead,

```
 1    liability will accrue on a per person basis.  As I just
 2    alluded to, there's a little bit of a debate about that
 3    interpretation.  It was a debate that reached the State
 4    Supreme Court early last year in a notable case called
 5    Cothron v. White Castle.
 6            In that case, the Supreme Court upheld an award
 7    for the plaintiffs, and because of that, because of the
 8    strict interpretation of the law as written, it was
 9    decided that White Castle was liable and the damages
10    that were facing were likely to be somewhere in the
11    neighborhood of 17 billion dollars.
12            The court, though, took note of that large
13    amount and they -- and the dispute over the way
14    liability accrues and they invited the General Assembly
15    to address this.
16            In fact, I'll read from the decision.  The Court
17    said, quote, "We respectfully suggest that the
18    legislature review these policy concerns and make clear
19    its intent regarding the assessment of damages under the
20    Act."
21            This bill is a response to that invitation and
22    it seeks to clarify the damages portion of this law in
23    the manner I just suggested.
24            I want to make sure that it's clear that this
25    bill in no way changes the biometric protections that
```

1    are currently in place in BIPA law.  It just changes the

2    way liability accrues and does so in a way that will

3    protect businesses from large judgments that could

4    essentially put them out of business.

5            Be happy to answer any questions, and I ask for

6    the Chamber's support.

7            UNIDENTIFIED SPEAKER:  Is there any discussion,

8    President Harmon?

9            SECRETARY:  Thank you, Mr. President.

10           Will the sponsor yield?

11           UNIDENTIFIED SPEAKER:  Indicates it will yield.

12           SECRETARY:  Thank you, Mr. President.

13           Senator Cunningham, in your opening remarks you

14   mentioned that in the White Castle decision, the

15   Illinois Supreme Court invited the General Assembly to

16   make clear our intent regarding the assessment of

17   damages under the Biometric Information Privacy Act.

18           Does this amendment to the Act clarify our

19   intention that the availability of discretionary

20   liquidated damages serves to deter future violations

21   without destroying a defendant's business?

22           PRESIDENT HARMON:  Senator Cunningham?

23           SENATOR CUNNINGHAM:  Yes.

24           UNIDENTIFIED SPEAKER:  Senator -- President

25   Harmon?

1        SECRETARY:  Thank you, Mr. President.

2        Senator, does this amendment to the Act suggest

3    any legislative intent to authorize a damages award that

4    would result in the financial destruction of a business?

5        PRESIDENT HARMON:  Senator Cunningham?

6        SENATOR CUNNINGHAM:  No.

7        PRESIDENT HARMON:  President Harmon?

8        SECRETARY:  Thank you, Mr. President.

9        Senator, does this amendment to the Act apply

10   retroactively to cases already decided or to pending

11   cases?

12       PRESIDENT HARMON:  Senator Cunningham?

13       SENATOR CUNNINGHAM:  No, but a court or

14   reviewing court could take judicial notice of our

15   amendment to the Act in determining an initial award or

16   in reducing an award.

17       PRESIDENT HARMON:  President Harmon?

18       SECRETARY:  Thank you, Mr. President.

19       To the bill?

20       UNIDENTIFIED SPEAKER:  To the bill.

21       PRESIDENT HARMON:  Ladies and gentlemen of the

22   Senate, I applaud the sponsor, Senator Cunningham, for

23   his tireless and often thankless work on this issue.

24       This was an express invitation from the Illinois

25   Supreme Court.  It is also in its final formulation a

```
 1    significant support of the Illinois business community,

 2    and I have expressed in other forums my disappointment

 3    that there has not been more robust support from the

 4    business community.

 5            I appreciate all those corporate citizens who

 6    have weighed in in support of the bill, but this is an

 7    unusual moment.  This is our caucus standing up for

 8    Illinois businesses, and I hope that we will see broad

 9    bipartisan support for this issue.  I urge you all to

10    vote yes.

11            Further discussion, Leader Curran?

12            SENATOR CURRAN:  Thank you, Mr. President.

13            The question of the sponsor?

14            PRESIDENT HARMON:  Indicates he will yield.

15            SENATOR CURRAN:  Thank you.

16            Senator Cunningham, we talked a little bit in

17    committee about what -- more so what's not in this bill.

18    There's a lot of business groups out there currently

19    opposed to the bill that you're bringing before us, and

20    I know -- first, let me thank you.  I know you spent an

21    exhaustive amount of time on this legislation meeting

22    with all of those -- meeting with those groups, keeping

23    our caucus, myself, specifically, involved and in the

24    loop on where negotiations were going.

25            I want to ask you specifically, one topic that's
```

1   been coming up a little bit recently is data centers,

2   and data centers are not the collector of biometric

3   information.

4          They are simply a processor store of data and

5   that data may or may not include biometric information.

6   This bill does not address the issues around data

7   centers and protections or exempting out someone that is

8   not a collector, and therefore it is possible that a

9   court would interpret this bill to apply to a store of

10  biometric information without consent.

11         PRESIDENT HARMON:  Senator Cunningham?

12         SENATOR CUNNINGHAM:  Thank you, Mr. President.

13  Thank you, Leader Curran for the question.

14         I think you've laid things out correctly.  Up --

15  first of all, while it's true that there are some

16  business groups that oppose the bill, I think that

17  opposition is rooted in the fact that they don't think

18  the bill goes far enough.

19         I think all would acknowledge that they are

20  getting relief from this bill.  There are many other

21  individual business and business associations who have

22  come out in support of the of the bill.

23         To your point, Leader Curran, about data

24  centers, I know you're aware and I'm aware of a letter

25  that was circulated this week by the Chicago and Chamber

1    of Commerce that has focused on this specific issue.

2         Illinois has done a really good job of

3    recruiting and establishing data centers in our state.

4    There are a number of reasons for that, and I think

5    it's, by some evaluations, we're second or third in the

6    nation.

7         But as you mentioned, Leader, we are now hearing

8    some data center developers being reluctant to come to

9    Illinois because of concerns about BIPA.

10        As we all know, data centers are essentially

11   clouds for computing, and those centers process millions

12   of data points a day, and obviously they could process

13   unwittingly biometric materials and their position, that

14   they're not in a position to get consent from the

15   individuals giving them, which is the key, we should

16   point out, to avoiding any litigation under BIPA.

17        Businesses can avoid it by gaining consent from

18   the individual giving biometric materials.  But to the

19   point, the data center developers are worried about

20   this.  To the best of my knowledge, no data center has

21   been sued under this litigation, although, I think they

22   raise a serious point and one that we should concern

23   ourselves with.

24        We had a number of requests for amendments to

25   deal with specific exemptions to the BIPA law.  That was

1   one of them that came late in the process.  There were

2   many others, and we considered them all.

3        At the end of the day, though, we decided to

4   remain focused on the invitation we got from the Supreme

5   Court to address the questions about liability and

6   damages, and we made a determination that that is

7   exactly what we would do with this bill and that's all

8   this bill does.

9        I think it's very important, what this bill is

10  doing, but it is limited to that specific point.  But I

11  agree with you, Leader, that the data center issue is an

12  issue that demands more consideration as we move

13  forward.

14       PRESIDENT HARMON:  Leader Curran?

15       SENATOR CURRAN:  Thank you, Leader Cunningham.

16       One other topic I wanted to touch on, we talked

17  a little bit about it in committee.  I've heard from

18  trucking companies that, as a safety feature, and

19  certainly they're operating nationwide, not just in

20  Illinois, but we are the transportation hub of the

21  country.  It's one of the great features, benefits that

22  Illinois has going for itself.  We're the middle of the

23  middle of the United States.

24       They use biometric information facial

25  recognition to ensure that their drivers are awake at

```
 1    the wheel, that their drivers are not driving more hours
 2    in a particular day than National I think it's Safety
 3    Standards Board permits.
 4          And what those companies, because of this law,
 5    what they're telling me they're doing is when those
 6    trucks are about to enter Illinois, they turn that
 7    feature off in Illinois, which I think is a really
 8    unfortunate result because those are safety features,
 9    not just from a liability standpoint from the trucking
10    company, but for every other Illinoisan or traveler on
11    the roadways throughout Illinois traveling with those
12    trucks, sharing the same space on the highways.
13          That also is not addressed in this.  I know
14    those concerns were raised.  Could you -- and I heard
15    what you said about being -- keeping this to what the
16    Supreme Court mentioned, but I just wanted to see if you
17    could offer a comment on that because that is another
18    area that I think we could make a very impactful step
19    forward in regards to this BIPA law.
20          PRESIDENT HARMON:  Senator Cunningham?
21          SENATOR CUNNINGHAM:  Thank you, Mr. President.
22          Thank you again, Leader Curran, for bringing up
23    what I think is a very important point.
24          You're correct.  This bill does not directly
25    address the issue that you just brought up, but I hope
```

 1   it does address it indirectly, and I'll tell you how.

 2          One of the things that's been explained to me to

 3   a number of businesses including trucking companies and

 4   the companies that provide the technology you described

 5   to them is that there is a fear of the unknown when it

 6   comes to BIPA because of the potential liability they

 7   are facing.

 8          And when I say the fear of the unknown, a lot of

 9   these technologies you talked about do not actually take

10   facial recognition images of the driver.  They take an

11   image of the driver to see if the driver maybe is

12   slouched over or is closing his or her eyes or on the

13   telephone, but, mostly, as far as I know, do not take a

14   biometric facial identification image.

15          But regardless of that, they're afraid how their

16   technology might be interpreted, and then if it's found

17   they are in violation of law, because of the repetitive

18   nature of the way liability accrues now, they could be

19   facing hundreds of millions and even billions of dollars

20   in damages.  So that is one of the reasons why they have

21   turned off that technology in the state.

22          I would hope but I'm not certain, to be honest,

23   whether or not this would help, but I think it can help

24   by limiting the threats of runaway liability that they

25   face right now.

```
 1          I will point out one other part of this bill
 2    that I didn't mention but I think is very important that
 3    is another change to the bill.  We clarify that when
 4    obtaining consent -- and, again, I will stress, all
 5    these businesses that have been sued under BIPA could
 6    have avoided liability if they got consent, written
 7    consent, from the individual who is providing them
 8    biometric materials.
 9          We have tried to modernize that part of the bill
10    and make it easier for businesses to get consent by
11    stating in this bill that an electronic signature does
12    suffice for consent.  No one really knew what electronic
13    signatures were in 2008.  That is now embedded in the
14    bill.  I hope that that makes it easier for trucking
15    companies and other in the transportation sector to
16    comply with the law and get consent in a pretty easy
17    fashion using an electronic signature.  I hope that
18    answers your question.
19          PRESIDENT HARMON:  Leader Curran?
20          SENATOR CURRAN:  To the bill, Mr. President?
21          PRESIDENT HARMON:  To the bill.
22          SENATOR CURRAN:  Well, first, I want to thank
23    Leader Cunningham for your clarification and again for
24    the amount of work you put into this in keeping us
25    involved on the progress throughout your work.
```

```
 1           I certainly understand why so many business
 2    groups are opposed and it's the underlying BIPA law.  We
 3    are a true outlier in this country.  This is not a law
 4    that other states are saying, yeah, Illinois got it
 5    right and we're going to follow suit.  We're going to
 6    model the Illinois law.
 7           And it's not because this is so onerous on
 8    business -- and this is an impediment, ultimately, to
 9    investment in Illinois and in our existing business
10    community.
11           However, there are also other business groups in
12    support of this, and I think they see it the way I see
13    it.  While I wish there was more in this, I think Leader
14    Cunningham pointed this out correctly, to do nothing
15    leaves Illinois businesses subject to really nihilistic
16    judgments that are company-ending judgments and losses
17    of jobs.
18           And while I wish there was more, and I know
19    there's good reason to be opposed to this bill, and I do
20    hope that as the House takes this up, the House most
21    especially takes a look at the data center issue.
22           I would be pleasantly pleased to see this bill
23    come back amended with an additional protection for data
24    centers at a minimum.  I ultimately do rise in support
25    of the bill.
```

1              Thank you, Mr. President.

2              PRESIDENT HARMON:  Leader Cunningham to close.

3              SENATOR CUNNINGHAM:  Thank you, Mr. President.

4      Thank you, Leader Curran, for your kind words and for

5      your counsel during the process of putting this bill

6      together.

7              I think it's important to stress that biometric

8      protections are very important.  I think we should be

9      proud of the fact that the State of Illinois has sought

10     to protect our biometric information.

11             We all read every day about data breaches and we

12     can imagine the damages that could be done to us as

13     individuals if our biometric materials were misused.

14     You can't change your fingerprint.  You might be able to

15     change a bank account number if you're a victim of fraud

16     or a credit card number, but you can't change your

17     fingerprint, so that's why it's important to have this

18     law in place.

19             However, as has been pointed out, certain

20     businesses I believe have been unfairly targeted by some

21     of the lawsuits that have been brought forth.

22             Everyone should be held accountable for not

23     following the law, and the businesses that have failed

24     to follow the law by getting consent to use biometric

25     materials should be held accountable.  But it's

```
 1    important that the punishment fits the crime.

 2          Right now, I don't think the law of the state

 3    accomplishes that.  This bill will ensure that it does.

 4          Appreciate the Chamber's support.

 5          PRESIDENT HARMON:  So the question is, shall

 6    Senate Bill 2979 pass?  All those in favor, vote aye;

 7    oppose, nay.

 8          The voting is open.

 9          Have all voted who wish?

10          Have all voted who wish?

11          Have all voted who wish?

12          Take the record on that question.  There are 46

13    voting yay, 13 voting nay, none voting present.  And

14    Senate Bill 2979, having to receive the required

15    constitutional majority, is declared passed.

16          (End of recording.)

17

18

19

20

21

22

23

24

25
```

JSA 29

```
 1                  C E R T I F I C A T I O N

 2

 3        I, Katherine Lenti, Certified Shorthand Reporter and

 4   Notary Public for the State of Illinois, do hereby certify

 5   that the foregoing is a correct transcript of the

 6   digitally-recorded audio in the above-entitled matter.

 7        I further certify that I am not related to nor an

 8   employee of counsel or any of the parties to the action,

 9   nor am I in any way financially interested in the outcome

10   of this case.

11

12        Dated this day, January 23rd, 2025.

13

14

15

16                                 Katherine Lenti
17                                 CSR No. 084.004958

18

19

20

21

22

23

24

25
```

**1**

**13** 15:13

**17** 3:11

**2**

**2008** 12:13

**2979** 2:4,7,12,17,25
15:6,14

**4**

**46** 15:12

**A**

**accomplishes**
15:3

**account** 14:15

**accountable** 14:22,
25

**accrue** 3:1

**accrues** 2:19,22 3:14
4:2 11:18

**acknowledge** 7:19

**act** 2:12,18,20 3:20
4:17,18 5:2,9,15

**additional** 13:23

**address** 3:15 7:6 9:5
10:25 11:1

**addressed** 10:13

**afraid** 11:15

**agree** 9:11

**alluded** 3:2

**amended** 13:23

**amendment** 4:18
5:2,9,15

**amendments** 2:8
8:24

**amends** 2:17

**amount** 3:13 6:21
12:24

**answers** 12:18

**applaud** 5:22

**apply** 5:9 7:9

**approved** 2:9

**area** 10:18

**Assembly** 3:14 4:15

**assessment** 3:19
4:16

**associations** 7:21

**authorize** 5:3

**availability** 4:19

**avoid** 8:17

**avoided** 12:6

**avoiding** 8:16

**awake** 9:25

**award** 3:6 5:3,15,16

**aware** 7:24

**aye** 15:6

**B**

**back** 13:23

**bank** 14:15

**basis** 2:22,23 3:1

**beginning** 2:1

**benefits** 9:21

**bill** 2:4,5,7,11,12,13,
15,17,25 3:21,25 5:19,
20 6:6,17,19 7:6,9,16,
18,20,22 9:7,8,9 10:24
12:1,3,9,11,14,20,21
13:19,22,25 14:5 15:3,
6,14

**billion** 3:11

**billions** 11:19

**biometric** 2:17 3:25
4:17 7:2,5,10 8:13,18
9:24 11:14 12:8 14:7,
10,13,24

**BIPA** 2:18 4:1 8:9,16,
25 10:19 11:6 12:5 13:2

**bipartisan** 6:9

**bit** 3:2 6:16 7:1 9:17

**Board** 10:3

**body** 2:6

**breaches** 14:11

**bringing** 6:19 10:22

**broad** 6:8

**brought** 10:25 14:21

**business** 4:4,21 5:4
6:1,4,18 7:16,21 13:1,8,
9,11

**businesses** 4:3 6:8
8:17 11:3 12:5,10 13:15
14:20,23

**C**

**called** 3:4

**card** 14:16

**case** 3:4,6

**cases** 5:10,11

**Castle** 3:5,9 4:14

**caucus** 6:7,23

**center** 8:8,19,20 9:11
13:21

**centers** 7:1,2,7,24
8:3,10,11 13:24

**Chamber** 7:25

**Chamber's** 4:6 15:4

**change** 2:25 12:3
14:14,15,16

**changing** 2:19

**Chicago** 7:25

**circulated** 7:25

**citizens** 6:5

**civil** 2:13

**clarification** 12:23

**clarify** 3:22 4:18 12:3

**clear** 3:18,24 4:16

**close** 14:2

**closing** 11:12

**clouds** 8:11

**collector** 7:2,8

**comment** 10:17

**Commerce** 8:1

**committee** 6:17
9:17

**community** 6:1,4
13:10

**companies** 9:18
10:4 11:3,4 12:15

**company** 10:10

**company-ending**
13:16

**comply** 12:16

**computing** 8:11

**concern** 8:22

**concerns** 3:18 8:9
10:14

**consent** 7:10 8:14,17
12:4,6,7,10,12,16 14:24

**consideration** 2:9
9:12

**considered** 9:2

**constitutional**
15:15

**context** 2:24

**corporate** 6:5

**correct** 10:24

**correctly** 7:14 13:14

**Cothron** 3:5

**counsel** 14:5

**country** 9:21 13:3

**court** 3:4,6,12,16 4:15
5:13,14,25 7:9 9:5
10:16

**credit** 14:16

AUDIO TRANSCRIPTION - JOB NO. 1413527
Senate Debate      Audio Labeled 04-11-2024 - Senate SB2979 3rd Reading.mp3

APRIL 11, 2024

Index: crime..interpreted

**crime** 15:1

**Cunningham** 2:4,6, 14,16 4:13,22,23 5:5,6, 12,13,22 6:16 7:11,12 9:15 10:20,21 12:23 13:14 14:2,3

**Curran** 6:11,12,15 7:13,23 9:14,15 10:22 12:19,20,22 14:4

**current** 2:21

**D**

**damages** 3:9,19,22 4:17,20 5:3 9:6 11:20 14:12

**data** 7:1,2,4,5,6,23 8:3,8,10,12,19,20 9:11 13:21,23 14:11

**day** 8:12 9:3 10:2 14:11

**deal** 8:25

**debate** 3:2,3

**decided** 3:9 5:10 9:3

**decision** 3:16 4:14

**declared** 15:15

**defendant's** 4:21

**demands** 9:12

**destroying** 4:21

**destruction** 5:4

**deter** 4:20

**determination** 9:6

**determining** 5:15

**developers** 8:8,19

**directly** 10:24

**disappointment** 6:2

**discretionary** 4:19

**discussion** 4:7 6:11

**dispute** 3:13

**dollars** 3:11 11:19

**driver** 11:10,11

**drivers** 9:25 10:1

**driving** 10:1

**E**

**early** 3:4

**easier** 12:10,14

**easy** 12:16

**electronic** 12:11,12, 17

**embedded** 12:13

**end** 9:3 15:16

**ensure** 9:25 15:3

**enter** 10:6

**essentially** 4:4 8:10

**establishing** 8:3

**evaluations** 8:5

**exempting** 7:7

**exemptions** 8:25

**exhaustive** 6:21

**existing** 13:9

**explained** 11:2

**express** 5:24

**expressed** 6:2

**eyes** 11:12

**F**

**face** 11:25

**facial** 9:24 11:10,14

**facing** 3:10 11:7,19

**fact** 3:16 7:17 14:9

**failed** 14:23

**fashion** 12:17

**favor** 15:6

**fear** 11:5,8

**feature** 9:18 10:7

**features** 9:21 10:8

**final** 5:25

**financial** 5:4

**fingerprint** 14:14,17

**fingerprints** 2:24

**fits** 15:1

**floor** 2:8

**focused** 8:1 9:4

**follow** 13:5 14:24

**formulation** 5:25

**forums** 6:2

**forward** 9:13 10:19

**found** 11:16

**fraud** 14:15

**future** 4:20

**G**

**gaining** 8:17

**General** 3:14 4:15

**gentlemen** 5:21

**giving** 8:15,18

**good** 8:2 13:19

**granted** 2:8

**great** 9:21

**groups** 6:18,22 7:16 13:2,11

**H**

**happy** 4:5

**Harmon** 2:2,14 4:8, 22,25 5:5,7,12,17,21 6:14 7:11 9:14 10:20 12:19,21 14:2 15:5

**heard** 9:17 10:14

**hearing** 8:7

**held** 14:22,25

**highways** 10:12

**honest** 11:22

**hope** 6:8 10:25 11:22 12:14,17 13:20

**hours** 10:1

**House** 13:20

**hub** 9:20

**hundreds** 11:19

**I**

**identification** 11:14

**Illinois** 4:15 5:24 6:1, 8 8:2,9 9:20,22 10:6,7, 11 13:4,6,9,15 14:9

**Illinoisan** 10:10

**image** 11:11,14

**images** 11:10

**imagine** 14:12

**impactful** 10:18

**impediment** 13:8

**important** 9:9 10:23 12:2 14:7,8,17 15:1

**include** 7:5

**including** 11:3

**indirectly** 11:1

**individual** 7:21 8:18 12:7

**individuals** 8:15 14:13

**information** 2:18 4:17 7:3,5,10 9:24 14:10

**initial** 5:15

**intent** 3:19 4:16 5:3

**intention** 4:19

**interpret** 7:9

**interpretation** 2:21 3:3,8

**interpreted** 11:16

**investment** 13:9

**invitation** 3:21 5:24 9:4

**invited** 3:14 4:15

**involved** 6:23 12:25

**issue** 5:23 6:9 8:1, 9:11,12 10:25 13:21

**issues** 7:6

**J**

**job** 8:2

**jobs** 13:17

**judgments** 4:3 13:16

**judicial** 5:14

**K**

**keeping** 6:22 10:15 12:24

**key** 8:15

**kind** 14:4

**knew** 12:12

**knowledge** 8:20

**L**

**Ladies** 5:21

**laid** 7:14

**large** 3:12 4:3

**late** 9:1

**law** 2:13,21 3:8,22 4:1 8:25 10:4,19 11:17 12:16 13:2,3,6 14:18, 23,24 15:2

**lawsuits** 14:21

**Leader** 6:11 7:13,23 8:7 9:11,14,15 10:22 12:19,23 13:13 14:2,4

**leave** 2:6,8

**leaves** 13:15

**legislation** 6:21

**legislative** 5:3

**legislature** 3:18

**letter** 7:24

**liability** 2:19,22 3:1, 14 4:2 9:5 10:9 11:6,18, 24 12:6

**liable** 3:9

**limited** 9:10

**limiting** 11:24

**liquidated** 4:20

**litigation** 8:16,21

**loop** 6:24

**losses** 13:16

**lot** 6:18 11:8

**M**

**made** 9:6

**majority** 15:15

**make** 3:18,24 4:16 10:18 12:10

**makes** 12:14

**manner** 3:23

**materials** 8:13,18 12:8 14:13,25

**meeting** 6:21,22

**mention** 12:2

**mentioned** 4:14 8:7 10:16

**middle** 9:22,23

**millions** 8:11 11:19

**minimum** 13:24

**mistake** 2:10

**misused** 14:13

**model** 13:6

**modernize** 12:9

**moment** 6:7

**move** 9:12

**N**

**nation** 8:6

**National** 10:2

**nationwide** 9:19

**nature** 11:18

**nay** 15:7,13

**negotiations** 6:24

**neighborhood** 3:11

**nihilistic** 13:15

**notable** 3:4

**note** 3:12

**notice** 5:14

**number** 8:4,24 11:3 14:15,16

**O**

**obtaining** 12:4

**occur** 2:20

**occurrence** 2:22

**offer** 10:17

**onerous** 13:7

**open** 15:8

**opening** 4:13

**operating** 9:19

**oppose** 7:16 15:7

**opposed** 6:19 13:2, 19

**opposition** 7:17

**order** 2:7

**outlier** 13:3

**P**

**part** 12:1,9

**pass** 15:6

**passed** 15:15

**pending** 5:10

**permits** 10:3

**person** 3:1

**place** 4:1 14:18

**plaintiffs** 3:7

**pleasantly** 13:22

**pleased** 13:22

**point** 7:23 8:16,19,22 9:10 10:23 12:1

**pointed** 13:14 14:19

**points** 8:12

**policy** 3:18

**portion** 3:22

**position** 8:13,14

**potential** 11:6

**present** 15:13

**President** 2:2,14,16 4:8,9,12,22,24 5:1,5,7, 8,12,17,18,21 6:12,14 7:11,12 9:14 10:20,21 12:19,20,21 14:1,2,3 15:5

**pretty** 12:16

**Privacy** 2:18 4:17

**process** 8:11,12 9:1 14:5

**processor** 7:4

**progress** 12:25

**protect** 4:3 14:10

**protection** 13:23

**protections** 3:25 7:7 14:8

**proud** 14:9

**provide** 11:4

**providing** 12:7

**punishment** 15:1

**put** 4:4 12:24

AUDIO TRANSCRIPTION - JOB NO. 1413527                                      APRIL 11, 2024
Senate Debate            Audio Labeled 04-11-2024 - Senate SB2979 3rd Reading.mp3Index: putting..voting

**putting** 14:5

## Q

**question** 6:13 7:13 12:18 15:5,12
**questions** 4:5 9:5
**quote** 3:17

## R

**raise** 8:22
**raised** 10:14
**reached** 3:3
**read** 2:5.11 3:16 14:11
**reading** 2:7,10,13
**reason** 13:19
**reasons** 8:4 11:20
**receive** 15:14
**recently** 7:1
**recognition** 9:25 11:10
**record** 15:12
**recording** 2:1 15:16
**recruiting** 8:3
**reducing** 5:16
**referred** 2:23
**relief** 7:20
**reluctant** 8:8
**remain** 9:4
**remarks** 4:13
**repetitive** 11:17
**requests** 8:24
**required** 15:14
**respectfully** 3:17
**response** 3:21
**result** 5:4 10:8
**retroactively** 5:10

**return** 2:7
**review** 3:18
**reviewing** 5:14
**rise** 13:24
**roadways** 10:11
**robust** 6:3
**rooted** 7:17
**runaway** 11:24

## S

**safety** 9:18 10:2,8
**Secretary** 2:5,11,12 4:9,12 5:1,8,18
**sector** 12:15
**seeks** 2:6 3:22
**Senate** 2:4,7,12,17, 25 5:22 15:6,14
**Senator** 2:3,6,14,16 4:13,22,23,24 5:2,5,6,9, 12,13,22 6:12,15,16 7:11,12 9:15 10:20,21 12:20,22 14:3
**serves** 4:20
**sharing** 10:12
**signature** 12:11,17
**signatures** 12:13
**significant** 6:1
**simply** 7:4
**slouched** 11:12
**sought** 14:9
**space** 10:12
**SPEAKER** 4:7,11,24 5:20
**specific** 8:1,25 9:10
**specifically** 6:23,25
**spent** 6:20
**sponsor** 4:10 5:22 6:13
**Standards** 10:3

**standing** 6:7
**standpoint** 10:9
**state** 3:3 8:3 11:21 14:9 15:2
**states** 9:23 13:4
**stating** 12:11
**step** 10:18
**store** 7:4,9
**stress** 12:4 14:7
**strict** 3:8
**subject** 13:15
**sued** 8:21 12:5
**suffice** 12:12
**suggest** 3:17 5:2
**suggested** 3:23
**suit** 13:5
**support** 4:6 6:1,3,6,9 7:22 13:12,24 15:4
**Supreme** 3:4,6 4:15 5:25 9:4 10:16
**swipe** 2:23

## T

**takes** 13:20,21
**talked** 6:16 9:16 11:9
**targeted** 14:20
**technologies** 11:9
**technology** 11:4,16, 21
**telephone** 11:13
**telling** 10:5
**thankless** 5:23
**things** 7:14 11:2
**threats** 11:24
**time** 6:21
**tireless** 5:23
**top** 2:3

**topic** 6:25 9:16
**touch** 9:16
**transportation** 9:20 12:15
**traveler** 10:10
**traveling** 10:11
**trucking** 9:18 10:9 11:3 12:14
**trucks** 10:6,12
**true** 7:15 13:3
**turn** 2:2 10:6
**turned** 11:21

## U

**ultimately** 13:8,24
**underlying** 13:2
**understand** 13:1
**unfairly** 14:20
**unfortunate** 10:8
**UNIDENTIFIED** 4:7,11,24 5:20
**United** 9:23
**unknown** 11:5,8
**unusual** 6:7
**unwittingly** 8:13
**upheld** 3:6
**urge** 6:9

## V

**victim** 14:15
**violation** 11:17
**violations** 2:20 4:20
**vote** 6:10 15:6
**voted** 15:9,10,11
**voting** 15:8,13

## W

**wanted**   9:16 10:16
**week**   7:25
**weighed**   6:6
**wheel**   10:1
**White**   3:5,9 4:14
**words**   14:4
**work**   5:23 12:24,25
**worried**   8:19
**written**   3:8 12:6

## Y

**yay**   15:13
**year**   3:4
**yield**   4:10,11 6:14

PRESIDING OFFICER: (SENATOR KOEHLER)

The regular Session of the 103rd General Assembly will please come to order. Will Members please -- please -- please be at their desks. The invocation today will be given by Pastor Stephen Lawrence of the Exodus Church of Springfield.

PASTOR STEPHEN LAWRENCE: (Invocation)

PRESIDING OFFICER: (SENATOR KOEHLER)

Please remain standing for the Pledge of Allegiance. Senator Johnson, please lead us.

SENATOR JOHNSON: (Pledge of Allegiance)

PRESIDING OFFICER: (SENATOR KOEHLER)

We have a request from WAND TV to record video, and from WGEM to record video and audio, and from Capitol News to photograph. Seeing no objection, leave is granted. Mr. Secretary, Reading and Approval of the Journal.

SECRETARY ANDERSON:

Senate Journal of Wednesday, April 10th, 2024.

PRESIDING OFFICER: (SENATOR KOEHLER)

Senator Glowiak Hilton.

SENATOR GLOWIAK HILTON:

Thank you, Mr. President. I move to postpone the reading and approval of the Journal just read by the Secretary, pending approval of the printed transcripts.

PRESIDING OFFICER: (SENATOR KOEHLER)

Senator Glowiak Hilton moves to postpone the reading and the approval of the Journal pending the arrival of the printed transcripts, there being no objection, so ordered. Mr. Secretary, Committee Reports.

SECRETARY ANDERSON:

1

        Senator Cunningham, on your bill.

SENATOR CUNNINGHAM:

        Thank you, Mr. President. Senate Bill 2979 amends the
Biometric Information Privacy Act, otherwise known as BIPA. And it
does so by changing the way liability accrues when violations of
the Act occur. Under the current interpretation of the law, a
liability accrues on a per occurrence basis, or sometimes that's
referred to as a per swipe basis, particularly in the context of
fingerprints. Senate Bill 2979 would change that. Instead,
liability will accrue on a per person basis. As I just alluded to,
there's a little bit of a debate about that interpretation. It was
a debate that reached the State Supreme Court early last year, and
a notable case called Cothron vs. White Castle (Systems, Inc.). In
that case, the Supreme Court, upheld an award for the plaintiffs.
And because of that, and because of a strict interpretation of the
law as written, it was decided that White Castle was liable. And
there -- the damages that we're facing were likely to be somewhere
in the neighborhood of $17 billion dollars. The court, though,
took note of that large amount and they -- and the dispute over
the way -- the way liability accrues. And they invited the General
Assembly to address this. In fact, I'll read from the decision.
The court said, quote, "we respectfully suggest that the
legislature review these policy concerns and make clear its intent
regarding the assessment of damages under the Act". This bill is
a response to that invitation, and it seeks to clarify the damages
portion of this law and the manor I just suggested I want to make
sure that it's clear that this bill in no way changes the biometric
protections that are currently in place in BIPA law. It just
changes the way liability accrues and does so in a way that will

                                                              57

protect businesses from large judgments that could essentially put
them out of business. Be happy to answer any questions, and I ask
for the Chamber's support.

PRESIDING OFFICER: (SENATOR KOEHLER)

    Is there any discussion? President Harmon.

SENATOR HARMON:

    Thank you, Mr. President. Will the sponsor yield?

PRESIDING OFFICER: (SENATOR KOEHLER)

    Indicates he will yield.

SENATOR HARMON:

    Thank you, Mr. President. Senator Cunningham, in your
opening remarks, you mentioned that in the White Castle decision,
the Illinois Supreme Court invited the General Assembly to make
clear our intent regarding the assessment of damages under the
Biometric Information Privacy Act. Does this amendment to the Act
clarify our intention that the availability of discretionary
liquidated damages serves to deter future violations without
destroying a defendant's business?

PRESIDING OFFICER: (SENATOR KOEHLER)

    Senator Cunningham.

SENATOR CUNNINGHAM:

    Yes.

PRESIDING OFFICER: (SENATOR KOEHLER)

    Senator -- President Harmon.

SENATOR HARMON:

    Thank you, Mr. President. Senator, does this amendment to
the Act suggest any legislative intent to authorize a damages award
that would result in the financial destruction of a business?

PRESIDING OFFICER: (SENATOR KOEHLER)

58

Senator Cunningham.

SENATOR CUNNINGHAM:

No.

PRESIDING OFFICER: (SENATOR KOEHLER)

President Harmon.

SENATOR HARMON:

Thank you, Mr. President. Senator, does this amendment to the Act apply retroactively to cases already decided or to pending cases?

PRESIDING OFFICER: (SENATOR KOEHLER)

Senator Cunningham.

SENATOR CUNNINGHAM:

No, but a court or a reviewing court could take judicial notice of our amendment to the Act in determining an initial award or in reducing an award.

PRESIDING OFFICER: (SENATOR KOEHLER)

President Harmon.

SENATOR HARMON:

Thank you, Mr. President. To the bill.

PRESIDING OFFICER: (SENATOR KOEHLER)

To the bill.

SENATOR HARMON:

Ladies and Gentlemen of the Senate, I -- I applaud the sponsor, Senator Cunningham, for his tireless and often thankless work on this issue. This was an express invitation from the Illinois Supreme Court. It is also, in its final formulation, a significant support of the Illinois business community. And I have expressed in other forms my disappointment that there has not been more robust support from the business community. I appreciate all

59

those corporate citizens who have weighed in in support of the bill. But this is an unusual moment. This is -- this is -- our caucus standing up for Illinois businesses. And I hope that we will see broad bipartisan support for this issue. I urge you all to vote Yes.

PRESIDING OFFICER: (SENATOR KOEHLER)

Further discussion, Leader Curran.

SENATOR CURRAN:

Thank you, Mr. President. Question of the sponsor.

PRESIDING OFFICER: (SENATOR KOEHLER)

Indicates he will yield.

SENATOR CURRAN:

Thank you. Senator Cunningham, we talked a little bit in committee about what more so what's not in this bill. There's a lot of business groups out there currently opposed to the bill that you're bringing before us. And I know -- first, let me thank you, I know you spent an exhaustive amount of time on this legislation meeting with all those -- meeting with those groups, keeping our caucus, myself specifically involved, and in the loop on where negotiations were going. I want to ask you specifically one topic that's been coming up a little bit recently is data centers. And data centers are not the collector of biometric information. They are simply a processor store of data. And that data may or may not include biometric information. This bill does not address the issues around data centers and -- and protections, or -- or exempting out someone that is not a collector, and -- and therefore it is possible that a court would interpret this bill to apply to a storer of biometric information without consent. Would that?

PRESIDING OFFICER: (SENATOR KOEHLER)

    Senator -- Senator Cunningham.

SENATOR CUNNINGHAM:

    Thank you, Mr. President. Thank you, Leader Curran, for the question. I think you've laid things out correctly. First of all, while -- while it's true that there are some business groups that oppose the bill, I think that opposition is rooted in the fact that they don't think the bill goes far enough. I think all would acknowledge that they are getting relief from this bill. There are many other individual businesses and business associations who have come out in support of the of the -- of the bill. To your point, Leader Curran about data centers, I know you're aware, and I'm aware of a letter that was circulated this week by the Chicagoland Chamber of Commerce that has focused on this specific issue. Illinois has done a really good job of recruiting and establishing data centers in our State. There are a number of reasons for that. And I think it's by some evaluations we're second or third in the nation. But as you mentioned Leader, we are now hearing some data center developers being reluctant to come to Illinois because of concerns about, BIPA. As we all know, the data centers are essentially clouds for computing, and those centers process millions of data points a day. And obviously they could process unwittingly, biometric materials and their position that they're not in a position to get consent from the individuals giving them, which is the key, we should point out, to avoiding any litigation under BIPA. Businesses can avoid it by gaining consent from the individual giving biometric materials. But to the point, the data center developers are worried about this. To the best of my knowledge, no data center has been sued under this

61

litigation. Although I think they raise a -- a serious point and one that we should concern ourselves with. We had a number of requests for amendments to deal with specific exemptions to the BIPA law. That was one of them that came late in the process. There were many others, and we considered them all. At the end of the day, though, we decided to remain focused on the invitation we got from the Supreme Court to address the questions about liability and damages. And we made a determination that that is exactly what we would do with this bill. And that's all this bill does. I think it's very important what this bill is doing, but it is limited to that specific point. But I agree with you, Leader, that the data center issue is an issue that demands more consideration as we move forward.

PRESIDING OFFICER: (SENATOR KOEHLER)

    Leader Curran.

SENATOR CURRAN:

    Thank you -- thank you, Leader Cunningham. One other topic I wanted to touch on. We talked a little bit about it in committee. I've heard from trucking companies that as a safety feature and certainly their operating nationwide, not just in Illinois, but we are the transportation hub of the country. It's one of the great features, benefits that Illinois has going for itself, where the middle of the -- middle of the United States, they had -- they use biometric information, facial recognition to ensure that their drivers are awake at the wheel, that their drivers are not driving more -- more hours in a particular day than National - I think it's Safety Standards Board (National Transportation Safety Board) permits. And what those companies, because of this law, what they're telling me they're doing is when -- when those trucks are

about to enter Illinois, they turn that feature off in Illinois, which I think is a really unfortunate result because those are safety features, not just from a liability standpoint from the trucking company, but for every other Illinoisan or traveler on the roadways throughout Illinois, traveling with those trucks sharing the same space on the highways. That also is not addressed in this. I know those concerns were raised. Could you -- and I heard what you said about being -- keeping this to what the Supreme Court mentioned, but I just wanted to see if you could offer a comment on that, because that is another area that I think we could make a very impactful step forward in regards to this BIPA law.

PRESIDING OFFICER: (SENATOR KOEHLER)

    Senator Cunningham.

SENATOR CUNNINGHAM:

    Thank you, Mr. President. And thank you again, Leader Curran, for bringing up what I think is a very important point. You're correct, this bill does not directly address the issue that you just brought up, but I hope it does address it indirectly. And I'll tell you how. One of the things that's been explained to me to a number of businesses, including trucking companies and the companies that provide the technology you described to them, is that there is a fear of the unknown when it comes to BIPA, because of the potential liability they are facing. And when I say the fear of the unknown, a lot of these technologies you talked about do not actually take facial recognition images of the driver. They take an image of the driver to see if the driver maybe is slouched over as closing his or her eyes or on the telephone. But mostly, as far as I know, do not take a biometric facial identification image, but regardless of that, they're afraid how their technology

might be interpreted, and then if it's found they are in violation of law because of the repetitive nature of the way liability accrues now, they could be facing hundreds of millions and even billions of dollars in damages. So, that is one of the reasons why they have turned off that technology in the State, I would hope, but I'm not certain to be honest, whether or not this would help. But I think it can help by limiting the threats of runaway liability that they face right now. I will point out one other part of this bill that I didn't mention, but I think is very important. That is another change to the bill. We clarify that when obtaining consent and again, I will stress all these businesses that have been sued under BIPA could have avoided liability if they got consent, written consent from the individual who was providing them biometric materials. We have tried to modernize that part of the bill and make it easier for businesses to get consent by stating in this bill that an electronic signature does suffice for consent. No one really knew what electronic signatures were in 2008 that is now embedded in the bill. I hope that that makes it easier for trucking companies and other in the transportation sector to comply with the law and get consent in a -- in a pretty easy fashion using an electronic signature. I hope that answers your question.

PRESIDING OFFICER: (SENATOR KOEHLER)

    Leader Curran.

SENATOR CURRAN:

    To the bill, Mr. President.

PRESIDING OFFICER: (SENATOR KOEHLER)

    To the bill.

SENATOR CURRAN:

Well, first I want to thank Leader Cunningham for your clarification and again, for the amount of work you put into this and keeping us involved on the progress, throughout, your work. I certainly understand why so many business groups are opposed, and it's the underlying BIPA law. We are a true outlier in this country. This is not a law that other states are saying, yeah, Illinois got it right, and we're going to follow suit and we're going to model the Illinois law. And it's not because this is so onerous on business. And this is an impediment ultimately to investment in Illinois and in our existing business community. However, there are also other businesses groups in support of this. And I think they see it the way I see it. While I wish there was more in this, I think Leader Cunningham pointed us out correctly to do nothing leaves Illinois businesses subject to really nihilistic judgments that are company ending judgments and -- and losses of jobs. And while I --I wish there was more, and I know there's good reason to be opposed to this bill, and I do hope, that as the House takes this up, the House most especially, takes a look at the data center issue. I would -- I would be pleasantly pleased to see this bill come back amended, with an addition -- additional protection for data centers at a minimum. I -- I -- I ultimately do rise in support of the bill. Thank you, Mr. President.

PRESIDING OFFICER: (SENATOR KOEHLER)

Leader Cunningham, to close.

SENATOR CUNNINGHAM:

Thank you, Mr. President. Thank you, Leader Curran, for your kind words and for your counsel during the process of -- of putting this bill together. I -- I think it's important to stress that

biometric protections are very important. I think we should be proud of the fact that the State of Illinois has sought to protect our biometric information. We all read every day about data breaches, and we can imagine the damages that could be done to us as individuals if our biometric materials were misused. You can't change your fingerprint. You might be able to change a bank account number, if you're a victim of fraud or a credit card number, but you can't change your fingerprint. So, that's why it's important to have this law in place. However, as has been pointed out certain businesses, I believe, have been unfairly targeted by some of the lawsuits that have been brought forth. Everyone should be held accountable for not following the law and the businesses that have failed to follow the law by getting consent to use biometric materials should be held accountable, but it's important that the punishment fits the crime. Right now, I don't think the law of the State accomplishes that. This bill will ensure that it does. I appreciate the Chamber's support.

PRESIDING OFFICER: (SENATOR KOEHLER)

The question is, shall Senate Bill 2979 pass. All those in favor vote Aye. Opposed, Nay. The voting is open. Have all voted who wish? Have all voted who wish? Have all voted who wish? Take the record. On that question, there are 46 voting Yea, 13 voting Nay, none voting Present. And Senate Bill 2979, having received the required constitutional majority, is declared passed. We're going to Senate Bill 3081, Senator Villanueva. Mr. Secretary, please read the bill.

ACTING SECRETARY KAISER:

Senate Bill 3081, an Act concerning education. 3rd Reading of the bill.